COMMONWEALTH *vs.* WILLIAM R. HORTON & others.

Essex. May 1, 1978 — September 19, 1978.

Present: QUIRICO, BRAUCHER, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Trial of defendants together, Examination of jurors, Mistrial, New trial. *Evidence,* Admissions and confessions, Motion to strike, Photograph. *Witness,* Cross-examination.

At the trial of three defendants on charges of armed robbery and murder in the first degree, the admission of evidence of extrajudicial statements made by each defendant, in which each defendant admitted his participation in the robbery from which the homicide resulted, did not require severance of the cases under the rule of *Bruton* v. *United States,* 391 U.S. 123 (1968) [388–390]; nor was severance required by the admission of testimony by two witnesses as to out-of-court statements by one of the defendants where the statements were inculpatory solely as to that defendant [390].

There was no merit to the contention of a defendant in a criminal case that he was entitled to severance of his trial from that of a codefendant because counsel for the codefendant pursued an antagonistic trial strategy in introducing certain evidence. [390–391]

In a criminal case, the judge's inquiry of all potential jurors as to their indifference and of the potential jurors called subsequent to the time the judge learned of a discussion of the pending case in the jury room as to whether they had discussed the cases with anyone who claimed to know the facts was adequate to ensure jury impartiality, and the judge was not required to ask further questions as to the substance of the discussion in the jury room as requested by the defendants. [391–395]

At a murder trial, the judge did not err in refusing to strike the testimony of a State chemist as to finding three brown smears on the vinyl covering of an automobile owned by one of the defendants even though counsel argued that they knew from a prior hearing in a District Court that the witness could not establish that the smears were of human blood where, at that stage of the proceedings, the questions were admissible [396–397]; nor did he err in denying the defendants' motions for a mistrial after the testimony was struck because the chemist was unable to identify the stains as

human blood where any prejudicial effect of the testimony was overcome by the judge's instructions to disregard it and by the subsequent testimony of another chemist who had determined that the stains were of human blood [397].

At the trial of three defendants on charges of armed robbery and murder in the first degree, the judge did not err in admitting in evidence a photograph of the victim's body after it had been moved by police from a trash can in the office of a service station and placed on the floor and a photograph of the body at the time of the post mortem examination, depicting several stab wounds on the body. [397–399]

At the trial of three defendants, the judge did not err in refusing to allow counsel for one of the defendants to call a prosecution witness back to the stand for cross-examination after she had been excused and had left the court room. [399–400]

At the trial of indictments charging armed robbery and murder in the first degree, there was sufficient evidence, including the defendant's admission of his involvement in the crimes, to support the jury's verdict of guilty as to both charges. [400]

A judge did not abuse his discretion in denying a defendant's motion for a new trial based on newly discovered evidence. [401–402]

INDICTMENTS found and returned in the Superior Court on January 10, 1975.

The cases were tried before *Linscott,* J., and motions for a new trial were heard by him.

*Stephen Hrones* for Alvin L. Wideman.

*Alfred Paul Farese* for Roosevelt Pickett.

*James A. Murphy* for William R. Horton.

*Michael T. Stella, Jr.,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. The defendants William R. Horton, Roosevelt Pickett, and Alvin L. Wideman were convicted after a jury trial of armed robbery and murder in the first degree. Motions for new trials were denied as to all defendants. The cases are before us pursuant to G. L. c. 278, §§ 33A-33G, on argued assignments of error as to certain pretrial and trial rulings and the denial of the defendant Horton's motion for a new trial based on a claim of newly discovered evidence. We conclude that there was no error, and that there is no basis to modify the jury's verdicts

or the judge's decision on the motion for a new trial or to grant the defendants any other relief under G. L. c. 278, § 33E.

Before addressing the defendants' assignments of error, we summarize the evidence. On the evening of October 26, 1974, between 9:45 P.M. and 10 P.M., the body of Joseph Fournier (Fournier), a seventeen year old service station attendant, was found in the office of the Marston Street Mobil service station in Lawrence. Testimony by the medical examiner indicated that Fournier died as a result of multiple stab wounds to the neck, chest, and other areas of the body. Fournier was last seen alive and working at the service station between 9:25 P.M. and 9:40 P.M. At that time he was carrying a roll of money which consisted of some of the service station's receipts for the day. Apart from a small accumulation of change, no money was found on Fournier's body by the medical examiner. A five dollar bill was found by police officers on the ground outside the service station. A subsequent inventory of the service station's sales for October 26, 1974, showed that $276.37 of the day's receipts was missing.

There was no testimony that any persons matching the defendants' descriptions were seen on the service station premises between the hours of 9 P.M. and 10 P.M. on October 26, 1974. However, one witness, John A. Greenwood, who lived in the close vicinity of the service station, testified as to several observations he made of a car and its occupants in the area on that evening. About 8:45 P.M., he observed a 1963 four-door Chevrolet automobile, with a bluish green bottom and white top, occupied by three black males, traveling very slowly past his house with its headlights on. Ten to fifteen minutes later, Greenwood observed the same car, this time with its headlights off but again traveling at a slow rate of speed and in the same direction. Greenwood left his house, and at approximately 9:30 P.M., when returning home, he again saw the same car and occupants. The car was parked with its headlights off, on a hill close to and facing the service station.

Another witness, Michael Byron, testified that as he was approaching the service station at approximately 9:45 P.M. his car was cut off by a large car proceeding very fast down the same hill described by Greenwood. Byron arrived at the service station shortly thereafter and discovered Fournier's body.

Witnesses Jesse Thomas (Thomas) and Thelma Thomas (Mrs. Thomas) testified that on October 26, 1974, the defendant Wideman was living with them at their house in Lawrence. Between 10:30 P.M. and midnight on that evening Wideman arrived at the Thomas house and told both Mr. and Mrs. Thomas that he had killed someone. Wideman told them that he had gone to a place and asked the man there to give him all his money, that the man complied and pleaded for his life, but that Wideman became angry, started stabbing him, and could not stop. Wideman also told them that he did not know whether the man was dead or not but thought that it would be in the newspaper the next day. Mr. and Mrs. Thomas dismissed Wideman's story at that time as being untrue. Two days later, on October 28, 1974, Mrs. Thomas read a newspaper article about Fournier's death and showed the article to Thomas and Wideman, whereupon Wideman stated, "I told you." When Thomas expressed disbelief in Wideman's story, Wideman said it was good that Thomas did not believe him and he hoped no one else would.

About 1:30 A.M., on November 8, 1974, Thomas met with Captain Stephen S. Sciuto, Jr., of the Lawrence police at the house of Fred Sciuto, who is Captain Sciuto's cousin and Thomas's foreman at work. Fred Sciuto had previously called Captain Sciuto saying he had information on Fournier's death. After a brief meeting with Captain Sciuto, Thomas went home. About 2:05 A.M., Captain Sciuto and other police officers went to the Thomas house, arrested and handcuffed Thomas in the presence of his wife, and brought him to the police station. There Captain Sciuto had a conversation with Mr. and Mrs. Thomas, subsequent to which certain police officers went

back to the Thomas house and brought Wideman to the police station.[1]

At the station, Wideman was informed of his Miranda rights and he had a conversation with Captain Sciuto, after which Captain Sciuto and other officers went to the defendant Pickett's house. When they arrived there about 3:20 A.M., Pickett was walking down the outside stairs. A 1963 four-door Chevrolet automobile with a blue bottom and white top was parked in front of the house. Pickett was stopped, and, after being informed of his Miranda rights and acknowledging that he understood them, he admitted that the car was his. Although Pickett was advised that he could refuse to let anyone search the car without a warrant, he gave Captain Sciuto permission to look through it. In searching the car Captain Sciuto found a knife under the front seat and Pickett admitted the knife was his.[2] Pickett was then handcuffed and taken to the police station.

The defendant Horton was picked up by police officers at his house about 5 A.M. The police read him his Miranda rights which he indicated he understood, and then they handcuffed and brought him to the police station.

Several police officers testified that at the police station the defendants were again informed of their Miranda rights which they acknowledged they understood. Then each defendant, in the presence of the other defendants and a number of officers, proceeded to give a statement concerning the robbery of the service station and the killing of Fournier.[3] Horton, who spoke first, stated

---

[1] Testimony elicited at the trial and at a voir dire examination indicated that the arrest of Thomas was undertaken to induce Mrs. Thomas to tell the police what she knew about Wideman's involvement in Fournier's death.

[2] Pickett's pretrial motion to suppress the evidence of the knife was denied after hearing.

[3] The statements given by the defendants were the subject of both pretrial and trial motions to suppress. The judge denied the motions and allowed the statements in evidence finding that they had been

that on the night in question the defendants were at a party in Lowell, and, on the way back to Lawrence, they decided to hold up a service station. Horton drove to a Mobil service station, parked on a hill, and stayed in the car while Pickett and Wideman went into the service station armed with knives. A short time later, Wideman came back to the car followed by Pickett. Horton asked Wideman and Pickett what had happened and Pickett said, "I had to destroy the evidence. Just another dead honky." Horton stated that the defendants then divided the money taken from the service station with each of them receiving approximately $70.

After Horton spoke, Pickett asked Wideman if he would tell the police what had happened but Wideman told Pickett that he instead should tell them. Pickett began his story by stating that the defendants had been at a party in Lowell, and, on their way to Haverhill, Horton suggested that they hold up a service station. Pickett said that he was driving and that he parked the car in the area of a hill close to the Mobil service station. Horton and Wideman went down to the service station armed with knives. Wideman came back to the car first, then Horton, and thereafter they drove to a bar in Haverhill where they divided the money which was in Wideman's pocket. Each of them received approximately $70 to $80. When Captain Sciuto showed Pickett the knife he had taken from the 1963 Chevrolet automobile, Pickett stated that, although the knife had been in his car on that evening, it was not the knife Horton took to the service station.

Wideman was then asked by the police if he had anything to say to which he responded in the negative. Pickett pleaded with Wideman to tell his side of the story, and, finally, Wideman reiterated much the same details as had Pickett. Wideman added that, although he had

voluntarily made and that the defendants had been accorded full Miranda rights.

held the attendant up at knife point and had taken the money, when he left the service station the attendant was still alive. When Captain Sciuto asked Wideman who had done the stabbing, Wideman said, "You have the knife. Find out from the fingerprints on the knife." After Wideman finished his story, Horton stated, "See, I told you they were going to frame me. I told you they'd lie." At that point all three defendants were booked.

Joseph D. Mastone, a State chemist, testified for the Commonwealth as to an examination he conducted on November 9, 1974, of the interior of the 1963 Chevrolet automobile. He performed benzidine reagent tests on three visible brown smears on the vinyl covering inside the car which tests indicated the presence of blood. Mastone acknowledged, however, that he had not conducted precipitin serum tests to determine whether the smears were of human blood. As a result, the judge struck Mastone's testimony as to the presence of blood in the car and instructed the jury to disregard it. However, the judge denied the defendants' motions for a mistrial. The Commonwealth's next witness, Ronald P. Kaufman, a chemist at the State police laboratory, testified that he had conducted both benzidine reagent tests and precipitin serum tests on the pieces of vinyl containing the smears and that they indicated the presence of human blood on the vinyl. Kaufman's testimony was allowed in evidence over the defendants' objections.

The evidence presented by the defense at trial mainly questioned the reporting procedures used by the police on October 26, and November 8, 1974, and the fact that no written or taped records were made at the time the defendants made their inculpatory statements. In addition, the defendant Horton called as an alibi witness his girl friend with whom he was living on October 26, 1974. She testified that on that night she had spoken to Horton about 8:30 P.M., that he had gone out for a drink, and that he came home at approximately 9:30 P.M., and remained there for the rest of the evening. Pickett called additional

witnesses who testified to the effect that his hair style on October 26, 1974, was different from that described by Greenwood as the hair styles of the three black men he had observed in the 1963 Chevrolet automobile near the service station. Another witness called by Pickett testified that he had known Pickett for a long time and that his reputation in the community for truthfulness was good, and that he was of good character.

The jury, apparently crediting the evidence presented by the Commonwealth, convicted the defendants of armed robbery and murder in the first degree. Subsequently, each defendant filed a motion for a new trial on each indictment based on alleged errors in the judge's rulings at trial and on the ground of newly discovered evidence. After a hearing, the judge denied the motions and filed separate findings and rulings as to each. In their motions for new trials on account of newly discovered evidence, the defendants alleged that in 1971 Thomas had shot a gun at the defendant Wideman and poured ammonia or lye on him. In his decision on the motions, the judge found that, although Thomas had never poured ammonia or any other substance on Wideman, he had shot a gun at him in 1971 grazing Wideman's head. The judge found further, however, that thereafter Thomas and Wideman remained friends, and by their actions in living and traveling together they treated the incident as inconsequential. Although the judge found that Wideman's attorney had known of this event prior to trial and had not informed counsel for Horton and Pickett or the district attorney, he ruled that the incident was not a sufficient reason to grant a new trial, stating that "it would have no real weight or materiality for possible use to impeach the credibility of Thomas."

During the trial the three defendants claimed a total of 591 exceptions, and, in addition, claimed 135 exceptions at the postconviction hearing on the motions for new trials. Of these exceptions, they set forth 127 alleged errors in their assignments of error, but argued only seven

assignments of error in their briefs. We treat the assign-
ments of error not briefed as waived. Mass. R. A. P. 16 (a),
as amended, 367 Mass. 921 (1975). S.J.C. Rule 1:13, as
amended, 366 Mass. 853 (1974). *Commonwealth* v. *Wat-
kins*, 375 Mass. 472, 474 n.2 (1978), and cases cited. Be-
cause some of the claims of error are argued by only one
defendant and others are argued by two or all the defend-
ants, we consider each issue separately below and indi-
cate which defendants join in the particular argument.[4]

1. *Motions to Sever (Pickett, Horton).*

Pickett and Horton alleged error in the denial of their
pretrial and trial motions to sever the cases of all three
defendants. They claim that they were entitled to sever-
ances primarily under the rule of *Bruton* v. *United States*,
391 U.S. 123 (1968), which held that at a joint trial of two
or more defendants the admission in evidence of a confes-
sion of a codefendant who did not take the stand and
which inculpated the other defendants violated the lat-
ters' rights under the confrontation clause of the Sixth
Amendment to the United States Constitution.

In the instant cases, none of the defendants testified at
trial. Police testimony was admitted as to the statements
made by all the defendants when they were interrogated
together at the police station. Unlike the *Bruton* case,

[4] The purported argument covering the majority of the assignments
of error raised by the defendant Horton in his brief and supplemen-
tary brief consists mainly of references to claimed exceptions and a
reiteration of the assignments of error followed by citation to certain
cases. These references fail to indicate the issues of law which may be
involved in the claims raised or even the propositions for which the
listed cases are cited, and, in general, are void "of anything that can
properly be called argument." *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958).
As such, we treat these assignments of error as waived. *Id.* See *Com-
monwealth* v. *Baptiste*, 372 Mass. 700, 701 (1977); *Commonwealth* v.
*Roberts*, 362 Mass. 357, 369 (1972); *Commonwealth* v. *Martin*, 358
Mass. 282, 290 (1970). However, as to those assignments of error raised
by Horton which are properly argued by other of the defendants,
Horton's claims are covered by our discussion. In addition, we fully
address three of Horton's assignments of error as to which we were
able to discern the substance of the argument presented.

each defendant admitted to the police that he participat-
ed in some way in the robbery and killing of Fournier
although the story of each differed as to certain particu-
lars. Horton claimed that he had stayed in the car while
Pickett and Wideman went down to the service station
armed with knives to commit the robbery, while Pickett
claimed that he had stayed in the car when Horton and
Wideman went down to the service station. Wideman
admitted holding up Fournier with a knife and taking the
money although he implied that Horton had done the
stabbing. These inconsistencies concerning the exact acts
performed by each of the defendants during the course of
the robbery and murder are, of course, irrelevant as to
the degree of each defendant's culpability under the doc-
trines of joint enterprise and felony-murder, theories as
to which the jury were charged and on which they could
reasonably have determined guilt. Consequently, none of
the admitted statements made by the individual defend-
ants while being interrogated together was any more
damaging to the other defendants. By reason of the ad-
mission by each defendant of his participation in the rob-
bery from which the homicide resulted, "no practical risk
was created that the jury would improperly use against
one defendant statements of another defendant." *Com-
monwealth* v. *Scott,* 355 Mass. 471, 477-478 (1969). See
*Commonwealth* v. *Lussier,* 359 Mass. 393, 399 (1971). No
statement made by any one of the defendants implicated
the other defendants in any substantially greater respect
than they themselves had admitted. *Commonwealth* v.
*Scott, supra* at 478. *Commonwealth* v. *Lussier, supra.* See
*Schneble* v. *Florida,* 405 U.S. 427, 431-432 (1972). More-
over, if there were any possible error in admitting the
confessions of the codefendants, in view of the inculpato-
ry statements each defendant made as to his own partici-
pation in the crimes such error would be harmless beyond
a reasonable doubt. See *Commonwealth* v. *LeBlanc,* 364
Mass. 1, 10 (1973); *Commonwealth* v. *Graves,* 363 Mass.
863, 872-873 (1973); *Commonwealth* v. *Scott, supra;*

*Brown* v. *United States*, 411 U.S. 223, 230-232 (1973); *Schneble* v. *Florida, supra* at 430-432; *Harrington* v. *California*, 395 U.S. 250, 254 (1968).

The argument raised by the defendants also seems to suggest that the testimony by Mr. and Mrs. Thomas as to Wideman's out-of-court admissions made in their presence may have violated the *Bruton* rule. We do not agree. Wideman's statements to Mr. and Mrs. Thomas were inculpatory solely as to himself. He stated that he had held up Fournier and that he had stabbed him. He did not name the other defendants as accomplices or otherwise refer to them. While we have recognized the view held by many courts that the "inculpatory connection" in an out-of-court statement made by a codefendant "may be supplied by *the content of the statement taken in connection with other evidence in the case*" (emphasis in original), *Commonwealth* v. *LeBlanc, supra* at 8, and cases cited, we do not think that the "content" of Wideman's statements to Mr. and Mrs. Thomas containing no references to the other defendants inculpated Horton or Pickettt within the meaning of *Bruton*. Moreover, at the request of the defendants the judge gave instructions to the jury limiting the testimony of Mr. and Mrs. Thomas solely to the case against Wideman. We have no reason to think that the jury ignored such instructions.

Apart from the *Bruton* issue, the defendant Pickett apparently argues that there was error in the denial of the motions to sever because counsel for the defendant Horton pursued an antagonistic trial strategy in (a) eliciting testimony regarding the police discovery of the five dollar bill at the service station and attempting to introduce the five dollar bill in evidence, and (b) introducing in evidence certain police reports. We find no merit to these arguments. Severance for such reasons is discretionary with the trial judge, and we think no abuse of such discretion has been shown here. *Commonwealth* v. *French*, 357 Mass. 356, 376 (1970), judgments vacated as to death penalty, sub nom. *Limone* v. *Massachusetts*, 408

U.S. 936 (1972). See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 221 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972).

2. *Examination of Prospective Jurors (Wideman, Pickett, Horton).*

All three defendants assign as error the refusal of the judge to question prospective jurors during empanelling as to the conversations in the jury room concerning the cases to be tried.[5] On the basis of the reports of such conversations, the defendants moved for a mistrial, a change of venue, the dismissal of the venire, and the discharge of all the jurors selected. All such motions were denied.

During the empanelling of the jury, the judge informed each juror of the essentials of the indictments against the defendants, asked each the questions required by G. L. c. 234, § 28, and, in addition, propounded a number of other questions including some suggested by counsel. On the first day of empanelling, four jurors were chosen and sworn. On the second day, before the fifth juror was chosen, a prospective juror indicated in response to the judge's questioning that he had heard "quite a bit upstairs" about the cases. Although the juror nevertheless indicated he could be neutral and the judge found him indifferent, he was peremptorily challenged by one of the defendants and excused. The judge continued the empanelling process, and jurors five through seven were sworn. Thereafter, another potential juror, in response to the judge's question whether he had formed an opinion as to the guilt or innocence of the defendants, responded, "Not actually. There has been some scuttlebutt discussion upstairs." This juror was subsequently excused by the judge on another ground.

---

[5] This argument is the only one raised by the defendant Wideman on appeal.

Although the judge refused the request of the defendants to inquire further of the excused jurors as to what the discussion in the venire room had been, he called the remaining venire into the court room and carefully and fully admonished them not to discuss the cases in the room where they were waiting to be called or elsewhere. Thereafter on that day the eighth juror was sworn.

On the third day of empanelling, another potential juror stated in response to the judge's questioning that on the previous day he had heard discussion in the jury room regarding the cases. In response to the judge's further question as to whether he nevertheless could be neutral, the juror stated: "I suppose I could. . . . What happens upstairs, you know, you are bound—someone says something, yes or no, or make an agreement, right?" The juror then clarified his somewhat ambiguous statement and his position by stating he had formed no opinion as to the guilt or innocence of the defendants. After asking the potential juror a number of other questions, the judge declared him indifferent, the defense challenged the juror for cause, the judge refused so to discharge him, and the defense then challenged the juror peremptorily. Counsel for two of the defendants at this point made oral motions for a mistrial which were denied. The empanelling process thereafter proceeded with jurors nine through eleven empanelled that day. During this process four other potential jurors stated that they had heard discussion of the cases in the jury room. Two of them stated that they remained neutral but they were peremptorily challenged by the defense after the judge ruled them indifferent. The other two were excused by the judge when they indicated that their neutrality was affected by what they had heard.

On the fourth day, the twelfth juror was chosen, subsequent to which a potential juror, in response to the judge's questioning, indicated that he had formed no opinion as to the cases although he had been in the "area" where the cases had been discussed. The judge found him

indifferent, disallowing the defendants' challenge for cause. However, the juror was subsequently peremptorily challenged by the defense and excused. Thereafter, because the original venire was exhausted, a new group of jurors was called and instructed, and, from this group, jurors thirteen through sixteen were chosen.

We disagree with the defendants' contention that the judge's refusal to inquire further of potential jurors as to conversations heard in the jury room constitutes reversible error in the circumstances detailed above. None of the jurors who indicated that he had heard the discussions "upstairs" sat on the jury. In fact, the twelve jurors who were chosen after the judge learned that there had been some discussion in the jury room stated that they had not discussed the cases with anyone who claimed to know the facts and circumstances surrounding the alleged crimes. In addition, the judge thoroughly, and, we think, adequately, instructed the original venire from which jurors eight through twelve were chosen and the second venire from which jurors thirteen through sixteen were chosen not to discuss the cases among themselves. Moreover, jurors one through fifteen were not challenged by the defense either for cause or peremptorily, and juror sixteen was not challenged for cause.[6]

The decision not to ask the further questions requested by the defendants was not error. Whether questions other than those required by statute and case law should be put to prospective jurors has been viewed historically as discretionary with the trial judge. *Commonwealth* v. *Silva,* 371 Mass. 819, 822 (1977). *Commonwealth* v. *Wygrzywalski,* 362 Mass. 790, 793 (1973). *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. 188, 295-296 (1971). *Commonwealth* v. *Stewart,* 359 Mass. 671, 677 (1971), judgment vacated as to death penalty, 408 U.S. 845 (1972). *Commonwealth* v. *Nassar,* 351 Mass. 37 (1966), appeal after re-

---

[6] At the time this juror was ruled indifferent by the judge the defendants' peremptory challenges had been exhausted.

mand, 354 Mass. 249, 252-253 (1968), cert. denied, 393
U.S. 1039 (1969). *Commonwealth* v. *Subilosky*, 352 Mass.
153, 158-160 (1967). *Commonwealth* v. *Geagan*, 339 Mass.
487, 503, cert. denied, 361 U.S. 985 (1959). Although in
the instant cases it would have been quite proper and,
perhaps, preferable if the judge had inquired further of
each potential juror individually as to conversations
heard in the jury room, the failure to do so did not consti-
tute an abuse of discretion. See *Commonwealth* v. *Field-
ing*, 371 Mass. 97, 116 (1976); *Commonwealth* v. *Benefi-
cial Fin. Co.*, *supra* at 296.

At the time these cases were tried, G. L. c. 234, § 28, as
amended by St. 1973, c. 919, provided that, in addition to
the four questions required to be asked of prospective
jurors as to their relationship to the parties, interest in
or opinion formed of the case, and bias or prejudice, "[f]or
the purpose of determining whether a juror stands indif-
ferent in the case, if it appears that, as a result of the
impact of considerations which may cause a decision or
decisions to be made in whole or in part upon issues
extraneous to the case, including, but not limited to, com-
munity attitudes, possible exposure to potentially
prejudicial material or possible preconceived opinions to-
ward the credibility of certain classes of persons, the ju-
ror may not stand indifferent, the court *may*, or the par-
ties or their attorneys may, with the permission and un-
der the direction of the court, examine the juror
specifically with respect to such considerations, attitudes,
exposure, opinions or any other matters which may, as
aforesaid, cause a decision or decisions to be made in
whole or in part upon issues extraneous to the issues in
the case" (emphasis supplied). In 1975, subsequent to this
trial, the statute was amended by St. 1975, c. 335, to the
extent that the word "may," emphasized above, was re-
placed with the word "shall." This change "impose[d] a
duty on [a] judge to examine jurors fully with respect to
possible bias or prejudice if it appears that particular
jurors or the jury pool as a whole may be influenced by

extraneous factors to the extent that jurors would be unable to render an impartial verdict on the evidence presented to them and must, therefore, be excused for cause. . . . [The] focus [of the statute] is . . . that . . . if there is reason to suspect that a juror or jurors are not or may not be indifferent within the meaning of the statue, the judge must inquire fully before declaring jurors indifferent and allowing them to be seated." *Commonwealth* v. *Dickerson*, 372 Mass. 783, 793 (1977).

Because these cases were tried before the 1975 amendment, the judge was not then under statutory mandate to inquire of potential jurors specifically as to conversations regarding the cases which they had or may have been exposed to. However, even if the cases had been tried subsequent to the statutory amendment, we do not think the judge's actions would necessarily have been error. His thorough inquiry of all potential jurors as to their indifference and of the potential jurors called subsequent to the time the judge learned of a discussion in the jury room as to whether they had discussed the cases with anyone who claimed to know the facts appears to have been adequate to ensure jury impartiality. As such, the present cases do not present a situation such as that in *Commonwealth* v. *Crehan*, 345 Mass. 609 (1963), where, when prejudicial newspaper articles were published during the trial, the judge refused to inquire of the empanelled jury whether they had read the articles and simply gave a general cautionary instruction to the jury at the trial's end. We held there that the proper course would have been for the judge to have made an immediate inquiry and to have given the jurors prompt instructions. In this trial the judge, apart from his refusal to ask the questions requested by counsel, was otherwise extraordinarily careful throughout the empanelling process to secure "a jury free from bias," as indicated by the many questions he asked of the jurors and the instructions which he gave them. *Commonwealth* v. *Kiernan*,

348 Mass. 29, 36 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts*, 380 U.S. 913 (1965).[7]

3. *Evidence of Bloodstains (Pickett)*.

Pickett argues that the judge committed error in (a) originally allowing in evidence the testimony of Mastone concerning blood stains found in the 1963 Chevrolet, and (b) denying the defendants' motions for a mistrial made after Mastone had acknowledged he could not identify the stains as of human blood and the judge had struck his testimony.

(a) Pickett argues that the judge erred in allowing Mastone to testify at all as to his discovery of the bloodstains because the Commonwealth knew in advance that the witness could not establish that the stains were of human blood. At trial, after Mastone had testified to finding the three brown smears on the vinyl covering inside the car, counsel for the defendants moved to strike the testimony arguing that they knew from a prior hearing in the District Court that the witness could not establish that the smears were of human blood. The judge denied the motions to strike, stating that the questions which were being asked of Mastone were admissible under the law, that he, the judge, had to deal with the evidence as it was presented, and, that, in due course, the defendants could cross-examine Mastone concerning the smears.

---

[7] At oral argument, counsel for the defendant Wideman called to our attention the recent case of *United States* v. *Herring*, 568 F.2d 1099 (5th Cir. 1978), decided after the submission of the briefs in these cases, contending that it represents a precedent for determining error in the judge's decision not to make further inquiry of potential jurors as to conversations in the jury room concerning the case to be tried. *Herring* involved the refusal of a judge to inquire of an empanelled and unsequestered jury whether they had read prejudicial newspaper articles concerning the case which were published during the trial. The court held that the refusal to conduct such an examination was reversible error, notwithstanding a brief preliminary instruction to the jury cautioning them to disregard any mention of the case outside the court room, because a presumption that some prejudice of impermissible dimension existed was required. We view the *Herring* case as involving a factual situation quite similar to that in *Commonwealth* v. *Crehan*, 345 Mass. 609 (1963), which we have already differentiated in our discussion above from the instant cases. As such we find the *Herring* decision similarly inapposite to the facts at bar. See *Commonwealth* v. *Beneficial Fin. Co.*, *supra* at 294.

While we think it would have been entirely proper for the judge to have held a voir dire examination at this point to determine what Mastone would testify to and the relevancy of such testimony (i.e., whether Mastone could identify the smears as being of human blood), such a course of action was not mandated. The judge's denial of the motions to strike was not erroneous at that stage of the proceedings.

(b) Pickett additionally argues that the judge committed error in denying the defendants' motions for a mistrial after the testimony was struck on the ground of Mastone's inability to identify whether the stains were of human blood. Although the judge did strike the testimony and instructed the jury twice to disregard it, Pickett claims that the prejudicial effect of the testimony could be cured only by granting a mistrial.

We disagree. Assuming, but without deciding, that Mastone's testimony was properly struck when it was determined on cross-examination that he was unable to say whether the stains were of human or animal blood, *Commonwealth* v. *Burke*, 339 Mass. 521, 535 (1959), the prejudicial effect, if any, was overcome by the judge's instructions and, more significantly, by the subsequent testimony of Kaufman. Kaufman, who testified to having conducted both benzidine reagent and precipitin serum tests on the smears, was able to determine that the stains were of human blood. Such evidence was clearly relevant and curative of the prejudice, if any, resulting from that portion of Mastone's previous testimony which had been struck.

4. *Photographs of Deceased (Pickett, Horton).*

Two color photographs of the deceased were admitted during the course of the trial. The first depicts Fournier's body after it was removed by police from a trash can in the office of the service station and placed on the floor. The police had apparently moved the body in a futile effort to locate a pulse in the victim's neck. The photograph depicts the body, the general area of the office,

loose change on the floor, and blood at the victim's head and feet, and on the office wall. The second photograph is of Fournier's body at the time of the post mortem examination and depicts several stab wounds on the body. The defendants argue that it was error to admit both photographs in evidence because of their inflammatory and prejudicial effect, and, as to the first photograph, that such prejudicial effect was increased, and any probative value weakened, by the movement of the victim's body before the photograph was taken.

We stated recently in *Commonwealth* v. *Stewart,* 375 Mass. 380, 385 (1978), that "[t]he fact that photographs may be inflammatory does not render them inadmissible if they possess evidential value on a material matter. *Commonwealth* v. *Lamoureux,* 348 Mass. 390, 392-393 (1965). *Commonwealth* v. *McGarty,* 323 Mass. 435, 438 (1948). The determination whether a photograph possesses such value is within the discretion of the trial judge. *Commonwealth* v. *Jones,* 373 Mass. 423, 426 (1977). A defendant who claims an abuse of this discretion must demonstrate that 'no conscientious judge, acting intelligently, could honestly have taken the view expressed by him.' *Commonwealth* v. *Bys,* 370 Mass. 350, 361 (1976), quoting from *Davis* v. *Boston Elevated Ry.,* 235 Mass. 482, 502 (1920). See *Commonwealth* v. *Amazeen,* 375 Mass. 73, 84 (1978)."

There was no abuse of discretion in these cases. The first photograph showing the victim's body in a small and confined area of the service station and depicting loose change on the floor, was probative as to both the murder and the robbery charges. The fact that the body was moved from its "slumped" and "contorted" position in the trash can onto the floor in order to take a pulse and that the picture was taken in this latter position does not defeat the photograph's probative value. This is not an instance, such as in *Commonwealth* v. *Richmond,* 371 Mass. 563, 564-565 (1976), where we held it was error to admit photographs which depicted post mortem injuries

which were not the result of the defendant's assault on the victim.

The second photograph depicting the victim at the post mortem examination was admissible as an aid in the jury's consideration of the testimony of the medical examiner and in their understanding the nature of the victim's injuries. *Commonwealth* v. *Stewart, supra* at 385, and cases cited.

*5. Cross-examination of Mrs. Thomas (Horton).*

Horton argues that it was error for the judge to refuse to allow him to call the witness Mrs. Thomas back to the stand after she had been excused so that his counsel might cross-examine her as to possible bias on her part toward the defendants.[8] The transcript reveals that the following occurred when Mrs. Thomas testified. She was called by the prosecution and testified at some length as to the defendant Wideman's statements made in her presence and concerning the events of November 8, 1974. After her direct examination, she was cross-examined at length by counsel for Wideman. At the conclusion of Wideman's cross-examination, the judge inquired of the prosecutor whether he wished to take Mrs. Thomas on redirect examination, and he said that he did not. Neither counsel for Pickett nor for Horton voiced a desire to cross-examine the witness, and she was excused. Thereupon, apparently after the witness had left the court room, counsel for Horton expressed his desire to cross-examine Mrs. Thomas. The judge said he could not.[9] A bench con-

---

[8] See discussion, *infra*, concerning the denial of Horton's motion for a new trial wherein the possible bias of the Thomases is discussed.

[9] As reported in the transcript, the following dialogue occurred:
HORTON'S COUNSEL: "Before Mrs. Thomas leaves your Honor?"
THE JUDGE: "She has gone."
HORTON'S COUNSEL: "Could I have her?"
THE JUDGE: "Can you what?"
HORTON'S COUNSEL: "I was going, could I approach the bench?"
THE JUDGE: "You want to ask if you can cross-examine?"
HORTON'S COUNSEL: "Yes."
THE JUDGE: "The answer is no."

ference followed at which the judge stated the following for the record: "[Counsel for the defendant Horton], after Mrs. Thomas had left the stand, as the record will disclose, arose and asked if he could cross-examine her. I told him he could not. Now, at the bench conference at the side bar he saves his right to not being allowed to cross-examine Mrs. Thomas."

We hold that there was no error in the judge's action. The record reveals that counsel for Horton had the opportunity to indicate in a timely fashion his desire to cross-examine Mrs. Thomas and he did not do so. There was no duty on the part of the judge to recall Mrs. Thomas after she had left the witness stand and, apparently, had departed the court room. Moreover, we think the claim of error asserted by Horton here was effectively waived in view of the fact that his counsel had the opportunity to call Mrs. Thomas for examination as a witness in the defendant's case and he did not do so.

6. *Sufficiency of Evidence (Horton).*

Horton argues that there was insufficient evidence for the jury to conclude that he was guilty of the crimes charged. He bases this argument on the fact that no black men were seen at the service station between 9:30 P.M. and 10 P.M. on October 26, 1974, the probable time span during which the service station was robbed and Fournier was killed. This argument has no merit. In addition to Horton's own admission of his involvement in the crimes charged, the prosecution produced evidence through the testimony of Greenwood that three black men were seen in the close vicinity of the service station during the times relevant to the robbery and murder. Such evidence, when considered with other significant evidence in the cases, was sufficient to support the jury's verdict that Horton was guilty of armed robbery and murder in the first degree.

---

HORTON'S COUNSEL: "May I approach the bench now, your Honor?"
THE JUDGE: "All right, I will see all of you. Come up."

7. *Motion for a New Trial (Horton).*

Horton's final argument is based on the denial of his motion for a new trial. The motion was based on the allegedly newly discovered evidence that in 1971 the prosecution witness Thomas had shot a gun at Wideman and poured ammonia or lye on him. Horton alleges that such evidence, if known at trial, could have been used to impeach Thomas as to his possible bias in testifying against the defendants.[10]

As noted earlier in this opinion, the judge found that Thomas had shot a gun at Wideman in 1971 but had not poured any substance on him. Although the judge found additionally that the incident of the shooting had not been known to counsel for Horton and Pickett at the time of trial, because of the inconsequential nature of the event as shown by the continuing amicable relationship between Thomas and Wideman, he denied the motion for a new trial ruling that the incident would have no weight or materiality in impeaching Thomas.

As repeatedly stated by this court, "[t]he motion for a new trial on the ground of newly discovered evidence [is] addressed to the sound discretion of the trial judge." *Commonwealth* v. *Grace*, 370 Mass. 746, 751 (1976), quoting from *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 542 (1971), and cases cited. "His disposition of it 'is not to be reversed unless a survey of the whole case shows that his decision, unless reversed, will result in manifest injustice.'" *Commonwealth* v. *DeChristoforo*, *supra*, quoting from *Sharpe, petitioner*, 322 Mass. 441, 445 (1948). Accord, *Commonwealth* v. *Grace*, *supra* at 752; *Commonwealth* v. *Robertson*, 357 Mass. 559, 562 (1970). Our examination of the transcripts of the hearing on the motion, as well as our consideration of the whole case, including the judge's findings and rulings, discloses no abuse of

---

[10] Horton also argues that such information could have been used to impeach Mrs. Thomas had Horton's counsel been allowed to cross-examine her. See discussion under part 5, *supra.*

discretion by the judge. There was no error in the denial of Horton's motion for a new trial.

8. *Review under G. L. c. 278, § 33E.*

As required by G. L. c. 278, § 33E, we have considered the cases in their entirety, both on the law and the evidence, and we conclude that (a) the verdicts were neither against the law nor the evidence, and that (b) the interests of justice require neither new trials nor the entry of verdicts of lesser degrees of guilt than were found by the jury.

*Judgments affirmed.*