COMMONWEALTH *vs.* ENFRID BROWN, JR.
(and two companion cases[1]).

Suffolk. February 5, 1979. — June 4, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & ABRAMS, JJ.

*Practice, Criminal,* New trial, Access to witnesses, Capital case, Defendant as co-counsel.

Evidence at a hearing on a motion for a new trial supported the judge's findings that testimony of two witnesses who had not testified at trial was not newly discovered and that their testimony was not credible. [168-172]

A judge did not err in declining to disclose the addresses of Commonwealth witnesses to defendants where the procedure employed accommodated the privacy interests of the witnesses with the right of the defendants to interview them. [172-173]

Defendants convicted of murder in the first degree were not entitled to a new trial or the entry of verdicts of a lesser degree of guilt under G. L. c. 278, § 33E, by the fact that an accomplice tried separately was convicted only of manslaughter. [173-174]

A defendant who is permitted to conduct the whole or any part of his defense in a criminal case does so in his individual capacity, is solely and individually responsible for his decision to do so and for the consequences resulting therefrom, and is not entitled to any title or designation of "counsel" or "co-counsel" in connection therewith. [174-175]

INDICTMENTS found and returned in the Superior Court on May 16, 1973.

Following review by this court, a second trial of the cases was held before *McGuire,* J., and a motion for a new trial was heard by him.

*Martin K. Leppo* for William J. Johnson, Jr.
*Reuben S. Dawkins* for John Clinkscales.

---

[1] Of the two companion cases one is against John Clinkscales and one is against William J. Johnson, Jr.

*Monroe L. Inker* for Enfrid Brown, Jr.

*Michael J. Traft,* Special Assistant District Attorney, for the Commonwealth.

QUIRICO, J. Hakim Jamal was shot to death in his Roxbury apartment by armed intruders on May 1, 1973. The defendants, Enfrid Brown, Jr., John Clinkscales, and William J. Johnson, Jr., were apprehended and charged with murder. On August 2, 1973, they were convicted by a jury of the crimes of murder in the first degree and of armed burglary. See G. L. c. 265, § 1; G. L. c. 266, § 14. On February 14, 1975, we reversed and remanded the cases for a new trial in light of the judge's use of an impermissibly coercive version of the so called *Tuey* charge. *Commonwealth* v. *Brown,* 367 Mass. 24, 32 (1975). On July 31, 1975, following a second jury trial limited to the murder indictments, the defendants were again convicted of murder in the first degree.

Thereafter, in January of 1976 Phillips Key and Isaac Mitchell were put to trial for the same offense. Key was allowed to plead guilty of manslaughter. After a jury trial at which Key testified, Mitchell was convicted of manslaughter. Brown, Clinkscales, and Johnson thereafter filed a joint motion for a new trial on the grounds of the manslaughter convictions of Key and Mitchell and of newly discovered evidence. The judge denied the motion after an evidentiary hearing.[2] Pursuant to G. L. c. 278, §§ 33A-33G, the defendants appealed to this court from the denial of their motion for a new trial. We affirm. We also hold that no relief under G. L. c. 278, § 33E, is warranted.

On the basis of the evidence at the defendants' second trial, the jury could have found the following facts. On

---

[2] Hearings on the defendants' joint motion for a new trial were held on May 5, 1977, and on August 3-4, 1977. In the interval between the filing of the motion and the hearing thereon, the defendants Brown and Johnson unsuccessfully sought habeas corpus relief in the Federal courts on an issue not now relevant. See *Brown* v. *Gunter,* 562 F.2d 122, 125 (1st Cir.), aff'g 428 F. Supp. 889 (D. Mass. 1977).

May 1, 1973, Hakim Jamal occupied a third-floor apartment with Hane Jamal, who described herself as Hakim's wife in a "spiritual" but not a legal sense, and with Crab Jamal, Kidogo Jamal, Linda Jacobs, and Linda's son Anthony Jacobs.[3] On the morning of May 1, Kidogo, who was employed at an industrial plant, escorted Hane to the personnel office of his employer and on that day she secured temporary employment there. During the day, Kidogo had an argument with one Louella Burns (also known as Sister Cissy).[4]

Burns informed members of an organization called "De Mau Mau" of her argument with Kidogo. Included among the members of the organization were the three defendants, as well as Key and Mitchell. These five individuals procured various firearms including handguns, carbines, and a rifle and drove to the Jamal apartment about 11 P.M. Leaving their car locked but with the engine running, all five ascended the stairs carrying the firearms. Key knocked on the door of the Jamal apartment and Kidogo answered. A German shepherd dog left the apartment while the door was open.[5] Kidogo attempted to close the front door, ran into the living room, and blocked the living room door closed with his body. Hakim, Hane, and Crab were also present in the living room. At the same moment, Anthony was in a bedroom at the other end of an interior hallway. Linda was in the kitchen, which was located between the bedroom and the living room.

---

[3] The names Hakim Jamal, Hane Jamal, Crab Jamal, and Kidogo Jamal were the "chosen names" of individuals having the given names Allen Donaldson, Elaine Cruckas, Michael Benders, and Melvin Dean, respectively. In this opinion, we honor the preferences of the various parties for their chosen names.

[4] The nature of this argument does not appear. The theory of the prosecution was, apparently, that the argument related in some way to Hane's presence at the plant and ended with Kidogo threatening Burns.

[5] The dog was shot to death on the stairway outside the apartment. There was evidence that Brown had shot the dog.

Key, Mitchell, and the three defendants entered the apartment. Johnson turned down the hall toward the bedroom. He kicked open the bedroom door and pointed a rifle at Anthony. Linda and Anthony, both of whom knew Johnson well, asked him not to hurt Anthony, and Johnson backed away. Key forced open the living room door, pinning Kidogo between the open door and a wall. Hakim attempted to raise a shotgun lying next to the chair in which he was sitting. Key quickly lay down on the floor. Mitchell fired several shots at Hakim, killing him. At some point during these events, Brown and Clinkscales were in the foyer area of the apartment where they were observed, respectively, by Linda and Anthony.

All five intruders left the apartment. Clinkscales shattered a window in the car in order to unlock the doors. Four of the five then drove away. After a brief investigation not here relevant, the police apprehended Mitchell and the defendants. Mitchell was released for a time and was later rearrested. Key remained a fugitive for over two years.

The present defendants were tried in July of 1973 and, after reversal by this court as noted earlier in this opinion, they were tried again in July of 1975. Mitchell was in custody during the second trial. Key was at large during the period of both trials. He surrendered to the police in November of 1975 and, together with Mitchell, was brought to trial in January of 1976.

1. *Motion for new trial.* The defendants filed their joint motion for a new trial on February 10, 1976, shortly after the end of Mitchell's trial. Their basic argument is this: Key's testimony at Mitchell's trial influenced the jury to convict Mitchell (who was, by all accounts, the person who actually shot and killed Hakim Jamal) only of manslaughter. This testimony was, however, not available to the defendants during either of their trials because Key remained a fugitive. In addition, Mitchell's testimony was not available to them during their second trial be-

cause he was then under indictment for the murder of Hakim Jamal, but he could now give testimony tending to prove that the killing was in self-defense. The testimony of Key and Mitchell was, therefore, newly discovered evidence justifying a new trial.[6]

Following an evidentiary hearing, the judge denied the motion for a new trial and filed a memorandum stating his findings of fact and conclusions of law. These findings, which are warranted by the evidence, are as follows. Key remained in Boston for about two weeks after the shooting. Between May 1, 1973, and November 26, 1975, when he surrendered to police, Key eluded police by traveling to and from Boston, Alabama, and New York city. Key was present in Boston during the second trial and knew of the trial. He did not, however, communicate with counsel for the defendants or offer to testify on behalf of the defendants. During the second trial of the present defendants, Mitchell was under indictment (the date of indictment not appearing in the record) and incarcerated within the Commonwealth. He did not volunteer to testify, and he was not summoned to testify.

Key's testimony at the Mitchell trial was to the effect that he, Mitchell, Brown, Clinkscales, and Johnson went to the Jamal apartment in order to protect Hakim from a threat on his life. Although Mitchell did not testify at his own trial, he did make an unsworn statement, after his conviction and before he was sentenced, in which he asserted that the present defendants had not received a fair trial and that Hakim was shot in self-defense. Mitchell reiterated essentially these same points at the hearing on the motion for a new trial in these cases. He also stated

---

[6] The defendants also asserted in their motion that Louella Burns had finally been located and had given a statement refuting Kidogo's testimony. Neither that statement nor any statement of additional testimony which Burns might give during a new trial was presented at the hearing. The defendants do not now rely on Burns's evidence. Accordingly, we deal only with questions arising from the current availability of Key and Mitchell.

that he went to the Jamal apartment in order to protect Hakim.[7] He would not, however, unequivocally state that he had not offered to testify during the second trial.

With respect to Key's testimony, the judge found insufficient proof that Key had never communicated with the defendants[8] or that defense counsel had diligently sought Key. He therefore ruled that Key's testimony was not newly discovered. The judge also found that, because Key was a close friend of the defendants, because he had previously failed to testify at either of their trials, and because his testimony contradicted that of "several trial witnesses who were apparently credited by the jury," the proposed testimony by Key was unworthy of credit.

With respect to Mitchell's testimony, the judge ruled that it was not newly discovered because Mitchell was, in fact, present in Boston and subject to summons. He stated, "It was a tactical decision by the defendants and their counsel not to request or subpoena Mitchell to appear at trial on their behalf to clear them of any involvement with the homicide. Having gambled and lost, defendants should not be allowed another new trial at which Mitchell might be called [to] testify." In addition, the judge found Mitchell's testimony "quite suspect as to its credibility."

A judge of the Superior Court may grant a new trial "[i]f it appears . . . that justice may not have been done." G. L. c. 278, § 29, as appearing in St. 1966, c. 301. In the absence of constitutional error, the granting of a motion for a new trial on the ground of newly discovered evi-

---

[7] Mitchell said that he was alone in the living room when the shooting occurred and that he fired from a prone position. All other accounts of the incident place Key on the floor and Mitchell just behind Key, firing over Key toward Hakim.

[8] The judge found that "testimony stating that [Key] never was in contact with the defendants themselves, either directly or indirectly" was "conspicuously absent." Key did, however, give such testimony. Construing the judge's statement to refer to credible testimony, we do not find the statement clearly erroneous.

dence rests in the sound discretion of the judge. *Commonwealth* v. *Horton,* 376 Mass. 380, 401 (1978). *Commonwealth* v. *Grace,* 370 Mass. 746, 751 (1976). *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 542 (1971). *Commonwealth* v. *Dascalakis,* 246 Mass. 12, 32-33 (1923). His decision "is not to be reversed unless a survey of the whole case shows that his decision, unless reversed, will result in manifest injustice." *Sharpe, petitioner,* 322 Mass. 441, 445 (1948). Accord, *Commonwealth* v. *Horton, supra,* and cases cited.

Manifest injustice is not shown merely by producing evidence that might, if presented, have influenced the trier of fact to reach a different result. *Commonwealth* v. *DeChristoforo, supra* at 542-543. *Commonwealth* v. *Robertson,* 357 Mass. 559, 562 (1970). Rather, the evidence "must be weighty and of such nature as to its credibility, potency, and pertinency to fundamental issues in the case as to be worthy of careful consideration." *Davis* v. *Boston Elevated Ry.,* 235 Mass. 482, 495 (1920). It must be "credible in character" and relate "to vital aspects of the case." *Commonwealth* v. *Dascalakis, supra* at 32. See also *Blaikie* v. *District Attorney for the Suffolk Dist.,* 375 Mass. 613, 618-619 (1978).

A thorough review of the evidence presented at the second trial and at the hearing on the motion for a new trial leaves us unpersuaded that "manifest injustice" will be done by allowing the verdicts to stand. The findings of the judge are based in large part on his conclusions as to the credibility of the oral testimony of witnesses, and they are supported by the evidence. Therefore, they are not ordinarily to be overturned on appeal. *Commonwealth* v. *DeChristoforo, supra* at 543. *Commonwealth* v. *Dascalakis, supra* at 25-26. "To the extent that the ... motion was based on facts which were neither agreed upon nor apparent on the face of the record, [the defendants] had the burden of proving such facts." *Commonwealth* v. *Bernier,* 359 Mass. 13, 15 (1971). Having failed to show that the story told by Key and Mitchell was

"newly discovered" in the sense of being unavailable and unknown during the trial (see *Nordblom* v. *Moss*, 351 Mass. 172, 176 [1966]; *Gilman* v. *Metropolitan Transit Auth.*, 345 Mass. 202, 204-205 [1962]) or that they diligently sought to procure the testimony of Key and Mitchell (see *Davis* v. *Boston Elevated Ry.*, *supra* at 496), the defendants cannot now complain that the judge erred in finding otherwise.

In addition, by reason of presiding over the trial, the judge was in the best possible position to weigh the credibility of the proffered evidence and to assess its probable impact on a jury hearing it together with the other evidence which had actually been presented. See *Commonwealth* v. *DeChristoforo*, *supra*; *Commonwealth* v. *Bernier*, *supra* at 16. The circumstances isolated by the judge—friendship with the defendants, participation in the criminal enterprise but not in the trial as a witness, and conflicts between the offered testimony and that given by other witnesses at trial—were all sufficient to warrant a finding of incredibility in *Commonwealth* v. *Grace*, *supra* at 752-753. See also *Commonwealth* v. *Stout*, 356 Mass. 237, 242-243 (1969); *Dirring* v. *United States*, 353 F.2d 519, 520 (1st Cir. 1965).

For all these reasons, we hold that there was no abuse of discretion in denying the motion for a new trial. We need not reach the question raised by the Commonwealth whether the defense of self-defense was available to the defendants if they were guilty of an unlawful armed intrusion into the Jamal apartment when the homicide occurred. See *Commonwealth* v. *Maguire*, 375 Mass. 768, 773 (1978); *Commonwealth* v. *Shaffer*, 367 Mass. 508, 511 (1975).

2. *Access to witnesses.* Clinkscales advances the argument that he was impermissibly denied the addresses of Commonwealth witnesses. The judge scrupulously followed the procedures prescribed or approved by this court in *Commonwealth* v. *Balliro*, 349 Mass. 505, 515-518 (1965), and *Commonwealth* v. *Carita*, 356 Mass. 132, 142-

143 (1969), as to a defendant's right of access to witnesses held in custody. The witnesses whose addresses were sought by Clinkscales were not, however, in custody. We nonetheless think that the judge's procedure, while not required, admirably accommodated the privacy interests of the witnesses with the right of the defendants to interview them. There was, therefore, no error in declining to disclose the addresses of the witnesses.

3. *Review under G. L. c. 278, § 33E.* The defendants strongly urge us to exercise our power under G. L. c. 278, § 33E, to reduce their convictions to manslaughter. Their argument is that because Mitchell, the actual killer, was convicted only of that lesser crime, they, who are only vicariously liable for Mitchell's actions, cannot equitably be sentenced to life imprisonment for murder in the first degree. We disagree.

A mere disparity in the verdicts returned by separate juries in the trials of accomplices "is not ordinarily enough to impel us to exercise our powers under § 33E." *Commonwealth* v. *Pisa*, 372 Mass. 590, 597, cert. denied, 434 U.S. 869 (1977). Accord, *Commonwealth* v. *Podlaski*, 377 Mass. 339, 349 (1979); *Commonwealth* v. *Hooks*, 375 Mass. 284, 297-299 (1978); *Commonwealth* v. *DeChristoforo*, 371 Mass. 26, 39-40 (1976); *Commonwealth* v. *Simpson*, 370 Mass. 119, 126-127 (1976). We have on occasion reduced verdicts in the exercise of our powers under § 33E when, coincidentally, separately tried accomplices received lesser sentences. See *Commonwealth* v. *Pisa, supra* at 597; *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 749-751 (1975); *Commonwealth* v. *Williams*, 364 Mass. 145, 151-152 (1973). We have done so, however, because the records of the trials themselves justified relief. Section 33E is not "designed to benefit a criminal defendant because one or more of his accomplices were exonerated when perhaps they should not have been." *Commonwealth* v. *Podlaski, supra* at 350.

After full consideration of the cases and issues now before us, both as to the law and the evidence, as required

by G. L. c. 278, § 33E, we conclude that the interests of justice neither require that the defendants be granted a new trial nor require the entry of verdicts of a lesser degree of guilt than the verdicts returned by the jury.

4. *Appointment of Brown as own co-counsel.* Before concluding this opinion we deem it appropriate to comment on a practice followed in these and a number of other criminal cases which have been appealed to this court. At the start of the second trial each of the three defendants filed a written motion that he be appointed as his own "co-counsel" at the trial. The reasons assigned as grounds for the motions by the defendants, either individually or by adoption of the statements of each other, were that they wanted to be present at all bench conferences, lobby conferences, and conferences of their attorneys with the prosecutor, and that they believed that they might thereby be able to assist their assigned counsel in the trial of the cases. The judge addressed the defendants on the advantage of having their counsel try the cases, but expressly informed them that under the decision of the United States Supreme Court in *Faretta* v. *California,* 422 U.S. 806 (1975), each defendant has a constitutional right to proceed to defend himself without counsel if he voluntarily and intelligently elects to do so. The judge further cautioned each defendant that "under our rules we can't have two people active in the same trial of one case" and that, in consequence, either the defendant or his attorney, but not both, would be allowed to question witnesses and to try the case.[9] The defendants indicated that they intended to let counsel try the cases, and they apparently did so throughout the trial.

---

[9] The judge's cautions were thus consistent with the post-*Faretta* conclusions of several Federal courts that there is no constitutional right to hybrid representation. See, e.g., *United States* v. *Sacco,* 571 F.2d 791, 793 (4th Cir.), cert. denied, 435 U.S. 999 (1978); *Maynard* v. *Meachum,* 545 F.2d 273, 277 (1st Cir. 1976); *United States* v. *Hill,* 526 F.2d 1019, 1023-1025 (10th Cir. 1975), cert. denied, 425 U.S. 940 (1976).

The hearing on the joint motion of the three defendants for a new trial started on May 5, 1977. The hearing on that date was conducted by defense counsel except that the defendant Brown made a number of comments and interjections and asserted his right to do so as his own "co-counsel." The hearing was then continued to August 3, 1977, on which date the proceedings were again conducted mainly by counsel. At the start of the proceedings on August 4, 1977, however, a document was filed bearing the names of the defendants Brown and Johnson stating that Johnson prohibited his assigned counsel from seeking any relief for him. When the judge asked Johnson about this, the latter asked, "Your Honor, could I have my brother Mr. Brown speak on this matter?" The judge recommended that either Johnson or Johnson's lawyer speak on the matter. The defendant Brown attempted to speak on the matter and said that he had drafted the document. The judge again asked Johnson what he wanted to do about the document; Johnson again said he wanted his brother [Brown] to speak on it, whereupon Johnson said that he withdrew the motion.

On the same date, August 4, 1977, Isaac Mitchell, who had previously been convicted of manslaughter for the same homicide for which the three present defendants had been convicted of murder, was called as a witness for the defendants on the motion for a new trial. Counsel for the defendant Brown stated that Brown, acting as his own "co-counsel," intended to conduct the examination of Mitchell. The witness was himself represented by counsel who was present throughout his testimony. The examination of Mitchell by Brown was marked by problems and incidents which were to be expected to follow from Brown's election to supplant his counsel for that examination, including, for example, attempts by Brown to advise the witness that he did not have to answer questions put to him by the prosecutor. On the same date Brown also personally examined another witness, Phillips Key, who had previously pleaded guilty of manslaughter for the same homicide.

We need not pass upon the wisdom of Brown's decision personally to conduct that part of his own defense himself rather than to avail himself of the services of his experienced and able counsel. However, the conclusion seems inescapable that Brown appeared to have acted in the belief that the allowance of his motion designating himself as his own "co-counsel" gave him some added right, standing, and stature to supplant his counsel. Brown's participation did not require that he be designated by the court as his own "co-counsel." We see no necessity for, nor propriety in, designating a defendant in a criminal case as his own "co-counsel." No person who is not a member of the bar can or should be designated as counsel or as "co-counsel" for himself or for anyone else. A defendant who is permitted to conduct the whole or any part of his own defense in a criminal case does so in his individual capacity, is solely and individually responsible for his decision to do so and for the consequences resulting therefrom, and is not entitled to any title or designation of "counsel" or "co-counsel" in connection therewith.

5. *Conclusion.* For the reasons stated in the body of this opinion, the judgments are affirmed.

*So ordered.*