DOUGLAS B. FOOTIT, individually and as administrator, *vs.*
RICHARD MONSEES & others.[1]

No. 87-80.

Plymouth. March 10, 1988. — July 6, 1988.

Present: GRANT, CUTTER, & BROWN, JJ.

*Practice, Civil,* Instructions to jury, Presumptions and burden of proof,
Special questions to jury. *Negligence,* Medical malpractice, Doctor.
*Medical Malpractice,* Standard of care, Expert opinion. *Witness,* Expert.
*Evidence,* Expert opinion, Relevancy and materiality, Redirect examina-
tion, Cross-examination.

At the trial of a malpractice action against two board certified obstetricians
and gynecologists brought by a plaintiff whose wife and unborn child
had died while under the defendants' care, the judge's references in his
charge to the jury to the nature of the plaintiff's burden to prove his
case by the weight of the evidence were neither excessive nor unbalanced,
and his instructions, taken as a whole, adequately explained the plaintiff's
burden of proof. [178-180]

There was no merit to the contention by the plaintiff in a malpractice action
against two doctors that special questions put to the jury regarding
proximate causation were likely to confuse them, where the jury's an-
swers to other special questions that there was no negligence on the part
of either doctor rendered the proximate cause issue immaterial; nor was
there merit to the plaintiff's contention that the judge may have confused
the jury by a mistaken use of words in his instruction on causation where
such error, unobjected-to by plaintiff's counsel at trial, was unlikely to
have had any effect upon the jury with respect to the special questions
relating only to the existence of negligence. [180-182]

At the trial of a medical malpractice action in which defense counsel, during
cross-examination of one of the plaintiff's expert witnesses, asked the
witness various questions about his prior testimony as an expert in
medical malpractice cases, and about how much he expected to be paid
for testifying in the present case, the judge, in his discretion, reasonably
limited efforts of plaintiff's counsel to rehabilitate the witness on redirect
examination, where the issue of the witness's bias was a collateral matter
not directly connected with the substantive issues of the case. [182]

[1] Richard R. Smith, and a professional corporation, Smith, Monsees,
and Penza, Inc.

At the trial of a malpractice action against two doctors, it was not error, in the circumstances, for the judge to restrict plaintiff's counsel's cross-examination of one of the doctors as to his failure to employ a certain type of diagnostic process referred to previously by a medical expert presented by the plaintiff. [182-184]

CIVIL ACTION commenced in the Superior Court Department on January 21, 1985.

The case was tried before *William H. Carey, J.*

*Eric A. Nissen* for the plaintiff.

*David M. Gould* (*John M. Dellea* with him) for the defendants.

CUTTER, J. Footit, individually and as administrator of the estate of his late wife, filed on January 21, 1985, a complaint alleging malpractice by two board certified obstetricians and gynecologists (and a professional corporation for which they acted). The alleged malpractice consisted of asserted failures (a) to diagnose correctly the medical conditions of Mrs. Footit, in the later stages of her pregnancy, and of her child, not born alive, (b) to conduct certain medical tests, and (c) to refer Mrs. Footit to an internist or a specialist in cardiology for evaluation and treatment. The case was tried from June 2 to 10, 1986, before a Superior Court judge and a jury. The judge denied the defendants' motions for directed verdicts.

On June 11, a verdict was returned on special questions that neither doctor was negligent with respect to Mrs. Footit or her stillborn child, and that no negligence of either doctor was the proximate cause of the illness or death of Mrs. Footit or the death of her unborn child. Footit has appealed from the judgment entered upon the verdict. A motion for a new trial was denied.

At trial there was evidence which would have permitted findings of the circumstances set out below. There was also conflicting expert medical testimony.

Mrs. Footit discovered that she was pregnant some time in August, 1982. She had some prenatal visits with physicians other than the defendants in the early stages of her pregnancy. She first consulted Dr. Smith, one of the defendants, on Novem-

ber 9, 1982. Thereafter he saw her about once a month through March. In addition Dr. Monsees (who was an office colleague) saw Mrs. Footit three times during the same period. It was expected that her child would be born about March 30, 1983. ·

When she first consulted with Dr. Smith, he took a medical history from her, in which she mentioned that her father had suffered from coronary artery disease. She did not tell him (and it did not appear as a result of his inquiries) that her brother had died from myocarditis.

The pregnancy seemed to make progress in an uneventful manner except, perhaps, for one occasion on December 27, 1982, when Mrs. Footit had called the office of Smith, Monsees, and Penza, Inc., with a complaint of nausea and vomiting. She asked for an appropriate medication. Dr. Penza prescribed one by telephone which relieved the situation.

On April 4, 1983, Mrs. Footit began feeling nauseated and was having difficulty breathing. On the 5th she had a sore throat and diarrhea and was vomiting. She was to have seen one of her doctors on April 7, but she made, because of her symptoms, an unscheduled visit to their Hingham office on April 6, where she went with her mother. She was still suffering from breathing difficulty, and her mother kept open the windows in the automobile to assist her breathing.

Dr. Monsees saw her and looked at her throat for bacterial infection, listened to her lungs, checked the baby's heart beat, and performed a pelvic examination. He did not listen to her heart. The records of the visit show complaints of diarrhea, vomiting, difficulty in breathing, and congestion. Her temperature and blood pressure were checked. Dr. Monsees concluded that she had flu-like symptoms.

Dr. Monsees next saw Mrs. Footit on April 11, at his Scituate office. There is no mention of breathing problems in the record of that visit. Mrs. Footit's weight, blood pressure, urine, and the fetal heart rate were checked. A pelvic examination showed that labor was imminent. He did not consider doing a caesarean section on Mrs. Footit, because the pelvic examination showed the situation "was favorable for a vaginal delivery" and Dr. Monsees testified that there was no indication of any heart

disease, which would cause him to consider a referral to a cardiologist.

On April 12, Mrs. Footit called the defendant doctors' office and left a message that she was "vomiting [and] want[ed] something for it." Dr. Monsees, when this message was conveyed to him, prescribed Compazine for it by calling the pharmacy. Footit noticed the baby kicking on the evening of April 12.

There was testimony that, in the middle of that night of April 12-13, Mrs. Footit called the office answering service to complain of shortness of breath. Dr. Smith returned the call and had a "fairly long" talk with Mrs. Footit. Her breathing (to which Dr. Smith testified he listened attentively) did not sound to be "labored." He suggested that a reactivated wood stove might have caused breathing difficulties. (The wood stove was later shut off with no apparent improvement in Mrs. Footit's condition.) Dr. Smith did not consider that the situation then disclosed to him called for reference of Mrs. Footit to an internist or a cardiologist at that time or indicated need for a caesarean delivery. Dr. Smith had not been told by Dr. Monsees of any facts concerning the latter's examination of, and prescribing for, Mrs. Footit during the preceding week.

Following her early morning talk with Dr. Smith, Mrs. Footit continued to have extreme difficulty breathing. She spent a restless night. After her husband left for work, she was taken to the South Shore Hospital by ambulance. The baby had died and was removed by caesarean section. Footit was informed that his wife was suffering from problems with her heart.[2] She was later transferred to Beth Israel Hospital in Boston, where (after a prolonged period of testing) she died on April 24, 1983.

---

[2] In a postmortem report (Beth Israel Hospital) about Mrs. Footit it was concluded that her death resulted from "peripartum cardiomyopathy." There was expert evidence which would have permitted a finding that the stillborn child would have survived if she had been delivered on April 6, or on April 11, 1983. The same expert witness testified that it was not probable that Mrs. Footit would have survived (as contrasted with possibly having a somewhat extended life) if her problems had been diagnosed earlier and the child had been delivered while still alive.

At trial the plaintiff contended that Dr. Monsees and Dr. Smith, or one of them, had deviated in various respects from accepted standards for "board certified" gynecologists and obstetricians, e.g., by not referring Mrs. Footit to a cardiologist or an internist; by not ordering an echocardiogram[3] or any comparable test, or listening to Mrs. Footit's heart; by failing to consolidate records currently in one of the corporation's offices; and by failing to inquire about Mrs. Footit's family medical history sufficiently to discover that Mrs. Footit's brother had died of myocarditis.

On each of these matters there was extended and significantly conflicting expert medical testimony. All relevant medical records appear to have been received in evidence. The medical experts, when properly framed questions were put to them by counsel, were patiently (and even helpfully) afforded by the trial judge reasonable opportunities to state their respective and conflicting opinions and views of the facts with considerable flexibility. Except as necessary in discussing the plaintiff's principal contentions on appeal with respect to the judge's rulings at trial, there is no occasion for reciting the conflicting expert testimony in great detail.[4]

---

[3] An echocardiogram is obtained by using a machine which employs high frequency sound waves to produce an image of the heart, which allows forming an "idea of how well the heart muscle is contracting."

[4] Footit presented two expert medical witnesses; Dr. William J. Sweeney, a board-recertified specialist in obstetrics and gynecology, and Dr. David C. Homans, a board-certified specialist in internal medicine and in cardiology and cardiovascular disease. Dr. Homans testified on cross-examination that "peripartum cardiomyopathy" is a relatively uncommon form of heart failure in women (see also Dr. Spodick, *infra*), and that its cause is unknown and that its diagnosis may be difficult because the symptoms of the malady are often symptoms which can appear in the last trimester of a normal pregnancy. Dr. Homans, like Dr. Sweeney, expressed the opinion that, according to accepted medical standards, the defendant doctors should have referred Mrs. Footit to a cardiologist or internist on the symptoms exhibited by her on April 6 and 11-12. The defendants called three other medical experts as witnesses, Dr. John Yeransian, and Dr. I. John Davies, each board-certified in gynecology and obstetrics, and Dr. David H. Spodick, board-certified in internal medicine and cardiology. All of them testified in effect that the symptoms exhibited by Mrs. Footit in early April, 1983, were those exhibited by a woman having a wholly normal pregnancy, and on the indications that she had (taking into account her influenza symptoms),

1. In behalf of the plaintiff, it is asserted that the trial judge's charge failed "to explain adequately the plaintiff's burden of proof in a civil action." The plaintiff's counsel suggests that, in the absence of some mention of "analogies to or elabora[tion] upon the mere phrase 'preponderance of the evidence,'" the jury may have been confused or misled.

The judge charged the jury that "in a civil case, the burden is on the person . . . bringing the claim . . . to satisfy you by the fair weight of the credible evidence, by the fair preponderance of the quality of the evidence[,] that the elements of his claim, which he has to establish, are prove[d] by him to your satisfaction." Later in his charge the judge told the jury: "The plaintiff is not required to exclude all possibilities that [harm of the general character alleged] resulted without fault on the part of the defendant. It is enough if he shows to your satisfaction that the harm which befell . . . [Mrs. Footit] or her baby was more likely due to the negligence of the defendant[s] than to some other cause for which they are not liable. If you find that it is just as likely that the condition either for . . . [Mrs. Footit] or for her baby was caused by something other than the negligence of the defendants, then you must find for the defendants. If on all of the evidence, it is just as reasonable to suppose or conclude that the cause is one for which no liability would attach to the defendants as one for which they are liable, then the plaintiffs have failed to make out their case."[5]

there was no failure by the defendant doctors to adhere to standards of accepted medical judgment and conduct for persons in their specialty and no occasion to refer her to a cardiologist or internist.

[5] The judge's instructions then proceeded: "But if you conclude that the resulting injury or death of either or both would not have occurred but for any negligent conduct of either defendant or both, and that the result was the material and probable consequence of the negligent act or omission of either or both [of the] defendant[s], or such negligence increased the risk of harm to the extent that it was a substantial factor in bringing about the result, then the negligent conduct may be considered by you as [a] proximate cause if the jury so decides." The judge gave careful and correct instructions that the jury were "the judges of the facts of this case" and that they were to pass upon the credibility of the witnesses and to weigh the believability of the witnesses, including the experts. It was their province, he said, "to give

At the close of the judge's charge, counsel for Footit objected to the judge's charge, primarily on the ground that the judge made excessive reference to the plaintiff's burden of proof, and that in his instructions on the plaintiff's burden, the judge "emphasized the defendant[s'] [per]spective . . . . [with the consequence that] the whole weight of the liability aspect of . . . [the] charge was weighted toward the defendant[s]." Repeated reference to the plaintiff's burden at least tended to counteract any suggestion that a more strict standard applied, because of a statement in the charge that a doctor is not "guilty" of negligence as long "as he complies with the legal standard of care." In any event, counsel for Footit did not request any clarification of the term "preponderance of the evidence" in the course of an ample opportunity following the charge to request further instructions before the jury retired.[6]

We consider the charge as a whole as we must. *Stepakoff* v. *Kantar*, 393 Mass. 836, 843 (1985). The instructions already mentioned (see note 5, *supra*, and the text of this opinion to which that note refers) put the issues to be decided by the jury in a simple common sense form, even if "one might prefer a more extended statement." See *Grassis* v. *Retik*, 25 Mass. App. Ct. 595, 601-602 (1988). The repetition by the judge's charge of references to the nature of the burden of the plaintiff to prove his case by the weight of the evidence does not seem to have been excessive or unbalanced. We perceive no error in the instructions on burden of proof.[7] See *Haskins* v. *Haskins*,

---

the testimony of each witness such credit or such discredit as you feel the testimony of that witness deserves."

[6] The judge, although at first refusing to do so, did give before the jury retired, at the request of Footit's counsel, a further charge with respect to the direct duty of the defendant doctors to the unborn viable fetus.

[7] The plaintiff's counsel made a late objection, after the jury retired, seemingly to the *accuracy* of a portion of the judge's charge which included the following paragraph, "[L]et me tell you at the outset what . . . [the standard of care of a doctor practicing a . . . specialty] is not. A doctor is not required to be perfect, none of us . . . [is] required to be perfect. A doctor is not to be free from all possible error. There is no absolute . . . guarantee from a doctor, unless it is by a promise, which is not alleged in this case, . . . of a safe delivery of every child and . . . the survival of every mother under all circumstances. Medicine is not an exact science. The

9 Gray 390, 392-393 (1857); *Callahan* v. *Fleischman Co.*, 262 Mass. 437, 438-439 (1928).

2. In behalf of the plaintiff it is argued that the special questions put to the jury were likely to confuse them. The questions are quoted or summarized in the margin.[8]

On the day prior to the jury charge, the judge announced his intention to submit the case on special questions. See Mass.R.Civ.P. 49(a), 365 Mass. 812-813 (1974). There was an extended discussion of them in chambers. We think the answers to questions 1, 3, 5, and 7, that there was no negligence on the part of either defendant doctor in the treatment either of Mrs. Footit or of her unborn child, completely dispose of the case. If there was no negligence on the part of the defendant doctors, as the jury clearly found, their negligence could not have been the proximate cause of any harm to Mrs. Footit or

---

diagnosis and the results that follow cannot always be foretold with accuracy or certainty under all instances." The plaintiff's counsel had made a brief reference to this paragraph before the jury retired in the context of his contention that undue weight had been placed by the judge on Footit's burden of proof and that the charge was "weighted toward the defendant[s]." He had not before the jury retired questioned the *accuracy* of the paragraph as matter of law. We note (in view of the tardiness of the plaintiff's suggestion) only that the paragraph (viewed with the balance of the instructions of the judge) seems to be consistent with the duty of a medical specialist as defined in *Brune* v. *Belinkoff*, 354 Mass. 102, 109 (1968); *Schwartz* v. *Goldstein*, 400 Mass. 152, 155 (1987); *Grassis* v. *Retik*, 25 Mass. App. Ct. at 602-603.

[8] Questions 1, 2, 5, and 6 (as set out below) should be read without paying any attention to the bracketed figures (and words or to the name, Dr. Monsees). Questions 3, 4, 7, and 8 should be read by substituting Dr. Monsees's name in brackets for the immediately preceding reference to Dr. Smith, and by giving the question the bracketed number. The questions (thus explained) read, with emphasis omitted:

"1.[3]   Was the defendant, Dr. Smith [Dr. Monsees] negligent with respect to his duty to . . . [Mrs. Footit?]"

"2.[4]   Was the negligence, if any, of Dr. Smith [Dr. Monsees] the proximate cause of the illness and death of . . . [Mrs. Footit?]"

"5.[7]   Was the defendant, Dr. Smith [Dr. Monsees], negligent with respect to the unborn child of . . . [Mrs. Footit?]"

"6.[8]   Was the negligence, if any, of Dr. Smith [Dr. Monsees] the proximate cause of the death of the unborn child of . . . [Mrs. Footit?]"

All eight questions were answered by the foreperson of the jury checking the word "No."

to her child. Where an answer to one special question is disposi-
tive of the case and renders immaterial the answer to another
special question, the dispositive answer is controlling and judg-
ment should be entered on that answer. *Riley* v. *Davison
Constr. Co.*, 381 Mass. 432, 442-446 (1980). See *Pemberton*
v. *Boas*, 13 Mass. App. Ct. 1015, 1017 (1982). See also
discussion in *Drake* v. *Goodman*, 386 Mass. 88, 94 (1982).

Footit's counsel argues that there were various errors by the
judge with respect to special questions 2 and 4, which asked
the jury whether any negligence of each of the defendant doctors
was a proximate cause of the illness and death of Mrs. Footit.
Footit did not contend that any negligence of either defendant
doctor caused her peripartum cardiomyopathy (see note 2,
*supra*) but that the doctors' conduct shortened Mrs. Footit's
life. The case had been tried on that basis. We regard it as
unlikely that special questions 1, 3, 5, and 7 (with respect to
the existence of *any negligence of the two doctors at all*) could
have been affected by an unduly broad interpretation (by the
jury) of questions 2 and 4 as applying to the *causation* of Mrs.
Footit's underlying heart disease.[9]

Footit's counsel also contends that the judge may have con-
fused the jury by a mistaken use of words in his charge on
causation. He told the jury they must find for the plaintiff if
Dr. Smith's conduct was not in accord with good medical
practice and in breach of the standard of care and skill of one
practising the specialty of obstetrics and gynecology "if the
result of that failure was the proximate *cause* of his negligence"
(emphasis supplied). There was a similar error later in the
charge. Obviously, the judge intended either (a) to use the
word "result" instead of the emphasized word "cause," or (b)
some different arrangement of the words of the clause. Footit's

---

[9] The judge probably should have instructed that Footit did not contend
that any negligence of the defendant doctors caused Mrs. Footit's underlying
heart disease, as the plaintiff asked him to do, although failure to do so
does not appear to have been prejudicial in effect. It should be noted,
however, that, although the judge invited them on a Friday before the final
arguments (on the following Monday) to file with him proposed special
questions, neither counsel did so before his charge on Tuesday.

counsel apparently did not notice the inadvertences at the time of the charge for he did not then bring them to the attention of the judge after the charge when they could have been corrected easily. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974). If counsel did not observe this error relating to *causation*, it was not likely to have had any effect upon the jury with respect to the special questions relating only to the existence of *negligence*.

3. Counsel for the defendant doctors, during cross-examination of Dr. Sweeney (called by Footit as an expert in obstetrics and gynecology, see note 4, *supra*), asked Dr. Sweeney various questions about his prior testimony as an expert in medical malpractice cases, and about how much he expected to be paid for testifying in the present case. He was asked also about his testimony *against* physicians in prior cases. The trial judge, on redirect examination, permitted Footit's counsel to obtain from Dr. Sweeney testimony (1) that the last time he had testified in a malpractice case it was *for* a doctor; (2) that he had testified only twice as an expert when called as a witness by Footit's counsel, and (3) that he had turned down malpractice cases in which he had been asked by Footit's counsel to testify as an expert. The trial judge, however, declined to permit Footit's counsel to go more extensively into the fifteen malpractice cases in which Dr. Sweeney (in the course of thirty-five years of practice) had testified as an expert. This issue of bias was a collateral matter not directly connected with the substantive issues of the present case. The judge, on such a collateral issue, in his discretion reasonably thus limited efforts to rehabilitate Dr. Sweeney on redirect examination. See *Commonwealth* v. *Mandeville*, 386 Mass. 393, 400 (1982). See also *Drake* v. *Goodman*, 386 Mass. at 92-94, and *Mason* v. *General Motors Corp.*, 397 Mass. 183, 193 (1986), where somewhat analogous matters are discussed.

4. Footit's final contention is that the trial judge improperly restricted his counsel's cross-examination of Dr. Monsees. To this the defendants' counsel replies that Footit's brief points out as wrongly excluded no specific question or questions put by Footit's counsel in the transcript area under discussion. The

latter's questions apparently were devoted to establishing that Dr. Monsees had not employed a so-called "differential diagnosis" referred to by Dr. Homans in his testimony and in related bench conferences. The particular questions to Dr. Monsees, the exclusion of which Footit's counsel asserts to have been error, apparently were those set out in the margin.[10] The judge could reasonably regard as improperly framed and not likely to be understood by either the witness or the jury, questions #2 and #4. He could regard as speculative any mere listing of *possible* illnesses revealed by the symptoms known to Dr. Monsees. The judge, however, did not preclude expressly an inquiry, by properly framed questions, which would have elicited from the witness (1) whether such symptoms, or any groups of them, were significantly consistent with or had significant tendency to suggest particular illnesses or types of illnesses, and (2) whether and to what extent the witness had considered the likelihood of the presence of such illnesses or types of illnesses, or had taken any action to exclude such illnesses or types of illnesses as a part of the diagnostic process. The judge also could reasonably have felt that much of the ground had been covered by prior testimony of Dr. Monsees or other witnesses and that counsel's inquiry was unnecessarily cumulative. We perceive no error in the judge's rulings in the

---

[10] In the following excerpts from the transcript all emphasis is supplied.

"Q [#1, by Footit's counsel] And together these [observations and symptoms of Mrs. Footit by or known to Dr. Monsees] represent potentially different illnesses, isn't that correct? [Objection sustained.]"

"Q [#2] Doctor, in looking at these symptoms, there is a potential — strike that — there is a differential diagnosis; is there not, Doctor? [Objection sustained.]"

"Q [#3] Well, among the *possibilities* with these symptoms that a pregnant woman — of a condition that a pregnant woman would have, Doctor, would be, number one, lung ailment; correct? [objection] THE COURT: No, the objection is sustained. We're not concerned with *possibilities* here."

"Q [#4] Well, Doctor, there are certain illnesses which more probably than not form a differential diagnosis when you have multiple signs and symptoms; isn't that correct? [objection] . . . THE COURT: No, the objection is sustained unless we're dealing with this particular person."

"Q [#5] With respect to . . . [Mrs.] Footit, Doctor, on April 6th, 1983, the findings of diarrhea, vomiting, difficulty breathing, congestion, represent a *possible* lung ailment; isn't that correct?" An objection was sustained.

.

circumstances. Cases (which deal more with causation than with negligence) relied on by Footit on this phase of the case do not seem inconsistent, in the circumstances, with the judge's rulings on evidence in the present controversy. See *Gilman* v. *Metropolitan Transit Authy.*, 345 Mass. 202, 205-206 (1962); *Civitarese* v. *Gorney*, 358 Mass. 652, 654-658 (1971); *Leavitt* v. *Bacon*, 89 N.H. 383, 392-393 (1938).

*Judgment affirmed.*