COMMONWEALTH vs. MARIO JAVIER CINTRON.

Hampden. September 14, 2001. - December 21, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Required finding, New trial, Capital case. *Joint Enterprise. Evidence,* Cumulative evidence, Videotape, Impeachment of credibility, Exculpatory. *Witness,* Impeachment.

At the trial of indictments for murder in the first degree and assault by means of a dangerous weapon, there was sufficient evidence on both charges to warrant the denial of the defendant's motions for required findings of not guilty. [514-516]

At a hearing on a motion for a new trial in a criminal case based on newly available evidence provided by a codefendant, the judge did not abuse his discretion in denying the motion, where his assessment that the newly available testimony did not present a substantial risk that a jury would arrive at a different result after hearing the new evidence was warranted. [516-518]

At a murder trial, the judge did not abuse his discretion in admitting in evidence a videotape recording of the defendant's brother beating the victim with a baseball bat several months prior to the victim's murder and, even if there was an abuse of discretion, the defendant suffered no prejudice because of the judge's strong limiting instruction to the jury. [518-519]

At a murder trial, the judge did not abuse his discretion in allowing a witness to testify on redirect examination to the defendant's gang affiliations, where the prosecutor was entitled to inquire about the reasons motivating inconsistent statements by the witness in order to rehabilitate the witness's testimony, and where the questioning revealed that the witness was testifying based on his personal knowledge and, therefore, formed a sufficient foundation [519-521]; further, the prosecutor established a sufficient foundation to impeach certain defense witnesses with their failure to bring exculpatory information to the police [522-525].

This court declined to exercise its extraordinary power under G. L. c. 278, § 33E, to grant the defendant a new trial or to reduce the murder verdict, where the fact that a codefendant agreed to plea to a lesser charge or that the prosecutor offered such an arrangement did not warrant § 33E relief for the defendant and was irrelevant to this court's inquiry. [525-526]

INDICTMENTS found and returned in the Superior Court Department on January 30, 1997.

The cases were tried before *Daniel A. Ford,* J., and a motion for a new trial, filed on November 19, 1999, was heard by him.

*Patricia A. O'Neill*, Committee for Public Counsel Services, for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant was convicted of the murder in the first degree of Harlen Hardrick and the assault by means of a dangerous weapon, namely a rifle, of Lincoln Hardrick. He claims the judge erred in (1) denying his motions for required findings of not guilty; (2) denying his motion for a new trial resulting from newly available evidence; (3) admitting videotape evidence of the defendant's brother beating the murder victim with a baseball bat several months prior to the shooting; and (4) allowing the improper impeachment of defense witnesses with insinuated association with gangs and allegations of recent contrivance. The defendant also requests that we exercise our plenary power under G. L. c. 278, § 33E, either to order a new trial or to reduce his murder conviction to a lesser degree of guilt. For the reasons set forth below, we affirm the convictions, affirm the denial of the motion for a new trial, and decline to exercise our power under G. L. c. 278, § 33E.

I. *Facts.*

We summarize the evidence in the light most favorable to the Commonwealth. *Commonwealth v. Gilbert*, 423 Mass. 863, 864 (1996). On July 22, 1996, a large crowd drew police to the 7-Eleven convenience store on Pleasant Street in Holyoke. On their arrival, police found an Hispanic man hitting another man with a bat. Officers immediately ordered the attacker to drop the weapon and he proceeded to strike the man once more before complying. Officers then placed the attacker under arrest, and he was later determined to be Mario Jesus Cintron (Mario).[1] The victim was Harlen Hardrick.

The defendant was not present at the scene during the fight. During the investigation of the murder leading to the defendant's conviction, he told police that he was aware that Mario had been arrested in connection with the fight at the 7-Eleven. He also stated that he was aware that Mario had a trial date ap-

[1]We shall refer to Mario Javier Cintron as the defendant and to his brother, Mario Jesus Cintron, as Mario.

proaching in which Harlen Hardrick would testify as the victim of the beating.

On January 20, 1997, Lincoln Hardrick, Harlen Hardrick's brother, was walking on Pleasant Street with Nelson Pacheco. They encountered Harlen near the parking lot adjacent to Mel's Restaurant. At that time, one of Lincoln's friends, described only as a white male with blond "spikey" hair, pulled up in a gray minivan. Harlen and Lincoln sent Nelson to go and purchase some marijuana, while they talked with the driver.

Nelson crossed Pleasant Street, went behind his apartment building at 489 Pleasant Street, and yelled to his brother, Victor Rios, that he wanted to buy some marijuana for Harlen. Victor was standing on a fourth-floor back porch with Jose Feliciano and the defendant. Victor then joined Nelson and went around to the front of the apartment building to the minivan in the parking lot adjacent to the restaurant where Harlen and Lincoln were standing. When Victor left, the defendant was still standing on the porch.

Victor told Lincoln and Harlen that they should leave the area. Moments later, Harlen noticed Mario and the defendant running across Pleasant Street in their direction, and yelled "look up" to Lincoln. Mario was carrying a rifle and the defendant was shouting things at the Hardricks in Spanish. Harlen and Lincoln turned and ran.

Mario fired a shot in the direction of Harlen and Lincoln, then paused. The defendant shouted, "Today's the last day to live," at the Hardricks, and shouted in English and Spanish to shoot and kill "that cabron."[2] Mario then fired five more shots at Harlen and Lincoln; one of which struck and penetrated the left side of Harlen's back, passing through his chest.

As Harlen and Lincoln ran, Harlen yelled to Lincoln that he had been hit; Harlen then collapsed. Lincoln carried him to a friend's house where he applied pressure to his wound while the friend called for an ambulance. When police arrived, they

[2]Jorge Rivera testified that "cabron" is a derogatory term in Spanish denoting a man who is aware that his wife is cheating on him, but does nothing about it. He also stated that it is particularly insulting to people of Puerto Rican descent.

put Lincoln in a cruiser and took him to the police station for questioning. Harlen died as a result of the gunshot wound.

After the shooting, Mario and the defendant fled behind the apartment block at 489 Pleasant Street, and Mario exclaimed in Spanish, "so they won't be such cabrones." The defendant emerged a few minutes later and was stopped by Officer Jennifer Sattler in front of the apartment building. Jorge Rivera recorded these and other events occurring after the shooting on videotape from his apartment window at 483 Pleasant Street, and he later gave it to the police. The defendant was wearing the same clothing he wore during the shooting; a white, yellow, and blue jacket and a white baseball cap. Officer Sattler detained him while she called dispatch to check the description of the perpetrators. While Officer Sattler detained the defendant, Mario came out of 489 Pleasant Street and passed his brother, without acknowledging him, on his way up the street. This too was recorded on Jorge Rivera's videotape. Because the dispatch officer had given an erroneous description of the perpetrators, Officer Sattler released the defendant.

Police returned to the apartment block of 489 Pleasant Street on several occasions during the investigation. Officers discovered two 7.62 caliber cartridges in a basement area beneath 489 Pleasant Street, where Mario lived. These cartridges were of the same caliber as those found in the parking area adjacent to the restaurant and had been "cycled" through the same weapon.

The day after the shooting, police brought the defendant to the Holyoke police department for questioning. The police offered him no inducement, he appeared sober and lucid, and police properly warned the defendant of his Miranda rights. He signed a Miranda card, acknowledging that he had been informed of his rights and that he understood them. He then proceeded to give a statement in response to questions posed to him by State Trooper Christopher Wilcox and Officer Edgar Lopez. The defendant stated that he was at his house most of the day, but left sometime in the evening to go to the 7-Eleven on Pleasant Street. He stated that he purchased a hot dog and a soda and consumed them in the store before walking home. As he was walking home he was stopped by a "woman cop" and

asked what he had been wearing earlier. He said that he was wearing black pants, a green sweater, and a yellow jacket. When asked if he remembered seeing his brother on the day of the incident, he stated that he had seen him in the afternoon before he went to the 7-Eleven, but not after. Officer Lopez watched the videotape from the 7-Eleven security camera between the hours of 7 P.M. and 8 P.M. on the date of the shooting and testified that the defendant did not appear. Jorge Rivera's videotape of the defendant shows that, after the shooting, he was wearing a yellow, white, and blue jacket and a white baseball cap.

Witnesses identified the defendant from photographs as the person standing beside the shooter and yelling to him to shoot and kill the victim. State Troopers Wilcox and John G. Murphy approached Lincoln Hardrick with photographic arrays at about 1:15 A.M. on January 21, 1997, and he immediately identified the defendant's brother as the shooter. They then showed him an array mistakenly believing that it included a photograph of the defendant. Lincoln did not make any identification from that array. Troopers Wilcox and Murphy approached Lincoln with another set of photographs containing a picture of the defendant at 3:20 P.M. that same day. Lincoln said that the array did not contain a photograph of the shooter and that he already had identified him for the police. He was heavily intoxicated at the time. Two days later, Trooper Wilcox showed Lincoln an array containing the defendant's photograph and he identified the defendant as the shooter's brother who was with him.

Trooper Wilcox also showed photographic arrays separately to Jorge Rivera and Carmen Rodriguez, Jorge's girl friend who lived with him and witnessed the same events on the day of the shooting. Jorge had a difficult time identifying the defendant from black and white photographs, but immediately identified him from color photographs. Carmen immediately identified the defendant as the brother of the shooter who was with him at the time of the shooting.

The Commonwealth produced evidence that the defendant attempted to intimidate and influence witnesses in his case. Jorge Rivera testified that the defendant and Jose Feliciano made threatening comments while he was in the apartment complex parking lot, attempting to repair dents in his automobile. He

testified that he overheard the defendant say that the person who made the videotape, referring to Jorge, would "be next" if he gave it to the police.

The defendant also referred to both Victor Rios and Nelson Pacheco as "rats" in the presence of other inmates in a jail cafeteria line while being held on bail. The defendant said it loudly enough that other inmates could hear. Victor also testified that the defendant told him to tell the defendant's attorney that he had nothing to do with the shooting, that Lincoln had a gun and shot first, and that the defendant came out to try to calm his brother down. Victor also testified that the defendant told him that he "wanted to go to the street" so that he could kill Lincoln Hardrick. Victor testified that he was beaten by Netas gang members the defendant associated with for giving a statement to the police. The defendant also rushed up to him, looked at him angrily, and called him a rat when they accidentally met in a holding room outside of the visiting area of the jail.

Police arrested the defendant and Mario and they were charged with murder in the first degree and assault by means of a dangerous weapon. The defendant and Mario were to be tried jointly, but the defendant's brother pleaded to voluntary manslaughter after the jury had been empanelled and sworn. The Commonwealth also offered the defendant the opportunity to agree to a plea of voluntary manslaughter on three separate occasions, and the defendant declined each time. The jury rendered guilty verdicts against the defendant.

II. *Discussion.*

A. *Sufficiency of the evidence.* The defendant contends that the trial judge erroneously denied his motions for required findings of not guilty because the Commonwealth failed to produce sufficient evidence of the defendant's and Mario's joint venture.

The test for determining the propriety of a judge's denial of a motion for a required finding is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*,

443 U.S. 307, 318-319 (1979). The Commonwealth has met this burden.

To prove joint venture, the Commonwealth must demonstrate beyond a reasonable doubt that the defendant was not only present at the commission of the crime, but that he aided, commanded, counselled, or encouraged the commission of the offense while sharing the mental state required for its commission. *Commmonwealth.* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). A joint venturer encourages, assists, or emboldens "by giving . . . hopes of immediate assistance," *Id.* at 472, quoting *Commonwealth* v. *Knapp*, 9 Pick. 495, 518 (1830), if he is by agreement in a position to render aid and "[t]he jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares*, *supra* at 470.

Based on the evidence introduced by the Commonwealth, the jury could reasonably find that the defendant was a willing participant in the commission of the crimes and shared with Mario the mental state required for their commission. The jurors could infer that the defendant overheard Nelson Pacheco yelling to his brother, Victor Rios, that Harlen wanted to purchase some marijuana, and became aware that Harlen Hardrick was in the parking lot across the street from the apartment complex. They could likewise infer that the defendant informed Mario of the Hardrick brothers' presence on the scene from testimony that Mario and the defendant ran out together. The evidence also indicated that the defendant, side-by-side with Mario, pointed in the direction of the victims, and shouted, "Today's the last day to live." He shouted to Mario to kill "that cabron." Mario then fired a volley of five shots at the victims in rapid succession, hitting and fatally wounding Harlen Hardrick. The defendant also fled behind the apartment complex with Mario after the shooting, and Mario exclaimed, "so they won't be such cabrones," in Spanish. The defendant lied to police about his whereabouts during the shooting, and threatened and attempted to influence witnesses testifying in his case. This evidence sufficed to establish beyond a reasonable doubt that the defendant was more than a passive observer during the commission of the

crimes, and in fact aided, counselled, and encouraged Mario in their commission.

The jury could also reasonably find that the defendant shared the mental state required for the commission of murder in the first degree with deliberate premeditation. The jury could infer that the defendant went to Mario's apartment after overhearing that Harlen and Lincoln Hardrick were across the street, and that he knew of the circumstances when he ran with his brother, who was carrying a high-powered rifle, out of the apartment complex and in the direction of the Hardricks. See *Commonwealth* v. *Soares, supra* at 470 (indicating mental state inferred when defendant knows of circumstances and participates in the offense). Moreover, the defendant made his mental state clear when he shouted words of direction and encouragement to his brother.

Finally, the Commonwealth submitted sufficient evidence for a reasonable jury to find that the defendant had the intent necessary to commit an assault by means of a dangerous weapon on Lincoln Hardrick. The defendant shouted to Harlen and Lincoln Hardrick, "Today's the last day to live," demonstrating that he had both the intent to commit an assault and also to put the victims in apprehension of unlawful contact. The defendant also shouted to Mario to "shoot him," showing that he was aware that Mario was wielding a dangerous weapon. The defendant's intent can also be inferred from his awareness of the circumstances and his efforts to encourage and direct Mario to shoot. *Id.*

B. *Motion for a new trial.* The defendant claims error in the judge's denial of his motion for a new trial based on newly available evidence through the testimony of Mario.

The standard applied to a motion for a new trial based on newly available evidence is the same as applied to one based on newly discovered evidence. *Commonwealth* v. *Figueroa*, 422 Mass. 72, 78-79 (1996). A trial judge may grant a new trial any time it appears that justice may not have been done. Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). The judge must determine, with a view to the evidence, whether there is a substantial risk that a jury would reach a different conclusion if presented with the newly available evidence. See *Com-*

*monwealth* v. *Grace*, 397 Mass. 303, 306 (1986); *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654 (1980).

In the absence of constitutional error, the granting of a motion for a new trial on the ground of newly discovered evidence rests in the sound discretion of the judge. *Commmonwealth* v. *Brown*, 378 Mass. 165, 170-171 (1979), and cases cited. The court on appeal will examine the judge's decision and will reverse only to avoid manifest injustice. See *Commonwealth* v. *Brown*, *supra* at 171; *Commonwealth* v. *Watson*, 377 Mass. 814, 839 (1979), *S.C.*, 409 Mass. 110 (1991); *Commonwealth* v. *LaBriola*, 370 Mass. 366, 368 (1976). Manifest injustice is not shown merely by producing evidence that might have influenced the trier of fact to reach a different conclusion if presented. *Commonwealth* v. *Brown*, *supra*. The evidence must be potent, pertinent, and creditworthy to fundamental issues in the case. *Id.*, quoting *Davis* v. *Boston Elevated Ry.*, 235 Mass. 482, 495 (1920).

We conclude that the motion judge, who was also the trial judge, did not abuse his discretion in denying the motion.[3] Reversal for abuse of discretion is particularly rare where the motion judge was also the trial judge and is in the best position to weigh the credibility of the proffered evidence and to determine its probable impact on a jury hearing it with all of the other evidence. See *Commmonwealth* v. *Moore*, 408 Mass. 117, 125 (1990); *Commonwealth* v. *Brown*, 378 Mass. 165, 172 (1979).

The judge concluded that the defendant failed to meet his

---

[3]The defendant claims that the judge, in deciding this motion, should not have applied the legal principles traditionally applied to motions for a new trial based on newly discovered evidence. Because this is a capital case, he argues, the judge should have applied a more favorable standard, namely the substantial likelihood of a miscarriage of justice standard, as this court has done when reviewing certain claims of ineffective assistance of counsel in direct appeals in capital cases, pursuant to G. L. c. 278, § 33E. See *Commonwealth* v. *Allen*, 430 Mass. 252, 255 (1999); *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). The defendant cites no case supporting his position, and we do not require judges to follow that approach. In any event, the defendant has not demonstrated that, in his case, the substantial likelihood of a miscarriage of justice standard would be any more favorable to him than the principles traditionally applied to motions for a new trial based on newly discovered evidence.

burden because the evidence he sought to admit was cumulative and not credible. The defendant sought to admit the testimony of Mario, the shooter, who was previously unavailable as a result of claiming his privilege against self-incrimination. Mario proposed to testify at the hearing on the motion for a new trial that the defendant did not encourage him to shoot the victim, but rather sought to calm him down so as not to shoot.

The motion judge concluded that Mario's newly available testimony did not present a substantial risk that a jury would arrive at a different result after hearing the new evidence. His assessment was warranted. The testimony of a codefendant who did not testify at trial is the "weakest sort of evidence." *Commonwealth* v. *Hennessey*, 23 Mass. App. Ct. 384, 385 (1987). "[I]f a new trial could be predicated as of right upon a codefendant's change of heart after a failure to take the stand there could always be a second chance for everyone." *Id.* at 386, quoting *Dirring* v. *United States*, 353 F.2d 519, 520 (1st Cir. 1965).

Mario's testimony was not credible. Mario pleaded guilty to manslaughter before the defendant's trial began, and, during his plea colloquy, specifically agreed with the prosecutor's statement that the defendant was running along side of him shouting, "shoot the cabron." Mario could have been impeached with these facts, if he had testified at trial.

Mario's testimony would have also been cumulative of what was already admitted at trial, and that type of evidence carries less weight than new evidence different in kind. *Commonwealth* v. *Scanlon*, 412 Mass. 664, 680 (1992), quoting *Commonwealth* v. *Grace*, *supra* at 305-306. Mario's testimony would not have differed in any particular way from the testimony of Jose Feliciano, who testified that the defendant was telling Mario not to shoot, and thereby supported the defendant's assertion that the Commonwealth's witnesses were mistaken in what they heard.

These considerations indicate there is no substantial risk that a jury provided with his testimony would reach a different result.

C. *Admission of a videotape of the beating of Harlen Hardrick.* The defendant claims that the admission of a videotape recording of Mario beating Harlen Hardrick with a baseball bat in the Pleasant Street 7-Eleven store several months

before the murder was erroneous because its probative value was outweighed by its prejudicial effect. The judge did not abuse his discretion in admitting the videotape, and even if he did, the defendant suffered no prejudice because of the judge's strong limiting instruction.

Our law as to the admission of potentially prejudicial evidence is clear. *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 431 (2001). It is within the sound discretion of the trial judge to determine whether the inflammatory nature of the evidence, including photographs and videotapes, outweighs its probative force. *Id.* The defendant bears a heavy burden to demonstrate an abuse of that discretion. *Id.* The defendant has not carried that burden in this case.

The judge viewed the proffered videotape in camera prior to its admission and determined that its potential prejudice did not outweigh its probative import. The Commonwealth offered the testimony of Officer Christopher Dunn, who responded to the event and described a portion of the beating. The defendant made no objection to the admission of Officer Dunn's testimony as unduly prejudicial and the videotape was a fair and accurate depiction of the same events. Additionally, the judge gave a strong limiting instruction as to the jury's use of the videotape evidence.[4] He instructed that the videotape could be used only on the issue whether Mario had a motive to act in the manner alleged on the date of the killing. There was no error.

D. *Impeachment of defense witnesses.* The defendant's fourth

---

[4]The judge instructed the jury as follows:

"Now it's not suggested by the Commonwealth that this defendant, . . . was in any way, shape or form connected in any alleged beating of anybody in July of [1996]. The Commonwealth does not make that claim and you may not take the evidence as any suggesting [*sic*] that that may be the case because that is simply not something which the Commonwealth is alleging. The Commonwealth is offering that evidence solely on the issue or the issues, . . . of number one, whether or not the alleged shooter in this case, . . . had a motive to do what he was alleged to have done, namely to shoot and kill the alleged victim . . . . Now the testimony is being offered on those issues and those issues only and you may consider it only for that purpose and not for any other purpose. So once again, it's being offered merely on the issue of the defendant's, and his alleged joint venturer's state of mind as of January 20th, [1997] and whether or not any motive existed to do the act as they're alleged to have acted on that date and for no other purpose."

claim of error, that the prosecutor improperly impeached defense witnesses, is composed of two separate claims.[5] First, the defendant argues that the prosecutor improperly implied, without establishing a proper foundation, that the defendant was associated with a gang. Second, the defendant maintains that the prosecutor improperly impeached defense witnesses with their failure to bring exculpatory information to the police without the foundation required under *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288 (1981). We treat each claim separately.

1. *Gang affiliation.* The defendant suggests that the prosecutor improperly attacked the defendant's character by insinuating, without foundation, that he had gang affiliations. The judge did not abuse his discretion in allowing Victor Rios to testify to the defendant's gang affiliations on redirect examination. After the prosecutor's direct examination of Victor Rios, defense counsel impeached him with prior inconsistent statements. Defense counsel highlighted several conversations Victor had with police and in which Victor said that Lincoln Hardrick was carrying a .25 caliber pistol and that he fired first at Mario. Defense counsel also asked Victor if he was a member of the "Latin Kings." Victor explained that he was no longer in the gang. Defense counsel then asked whether Mario and the defendant were affiliated with gangs and Victor responded that they were not "Kings."

On redirect examination, the prosecutor questioned Victor about his prior inconsistent statements and his reasons for giving them. Victor explained that he gave those statements while he was incarcerated with Mario and the defendant. Victor said that both Mario and the defendant had spoken to him about his testimony while they were in jail. The defendant told Victor to help him and to say that he was not there when Mario was shooting. Victor said that when he spoke with defense counsel and an investigator, he acceded to the defendant's and Mario's

---

[5]The defendant devotes only a few lines and a footnote to the fact that the prosecutor cross-examined defense witnesses in regard to their association with the defendant while in jail. The defendant's comments are not sufficient to rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also *Commonwealth* v. *Simpson*, 434 Mass. 570, 577 n.3 (2001). In any event, we conclude this line of questioning was probative of bias or motive to lie and was, therefore, relevant.

requests because he was afraid. Victor feared the defendant and Mario because they had "a lot of people behind them." The prosecutor, probing further, elicited testimony from Victor that the defendant and his brother were affiliated with the Netas gang.[6]

When a witness has been impeached, the party who called the witness may introduce evidence that explains or contradicts the impeachment evidence. *Commmonwealth* v. *Errington*, 390 Mass. 875, 879-881 (1984). See *Commonwealth* v. *Donovan*, 17 Mass. App. Ct. 83, 87 (1983) (error for judge to exclude questions to defendant on redirect examination to explain inconsistent testimony on cross-examination). Reasonable limitations may be imposed on redirect examination in the judge's discretion. See *Commonwealth* v. *Maltais*, 387 Mass. 79, 92 (1982). See also *Footit* v. *Monsees*, 26 Mass. App. Ct. 173, 182 (1988). In this case, the Commonwealth was entitled to inquire about the reasons motivating Victor's inconsistent statements. The admission of this evidence in connection with the prosecutor's attempts to rehabilitate Victor's testimony was not an abuse of the judge's discretion, and therefore, was not error.

The defendant also argues that the testimony was improperly admitted because it lacked foundation. We reject his argument. The only foundation required for the testimony of lay witnesses is the ability to perceive, recall, and recount information within the witness's personal knowledge. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 656-657 (1980). When the prosecution elicited testimony from Victor that the defendant and his brother were gang members, defense counsel objected. The judge sustained the objection and instructed the prosecutor to lay a foundation. The prosecutor then elicited Victor's testimony that he learned of the defendant's gang affiliations when they were in jail together and he saw the defendant with members of the Netas gang. Victor also stated that these individuals were the same persons who beat him when he provided a statement to the police. The questioning revealed that Victor Rios was testifying based on his personal knowledge and, therefore, formed a sufficient foundation.

---

[6]Victor Rios explained on recross-examination by defense counsel that the "Netas gang is a jail thing."

2. *Recent contrivance.* The defendant also claims that the prosecutor improperly impeached defense witnesses with their failure to bring exculpatory information to the police. This means of impeachment may be used to show recent contrivance or bias in favor of the defendant. *Commonwealth* v. *Cefalo*, 381 Mass. 319, 338 (1980). "A witness's silence in such circumstances is akin to a witness's 'prior inconsistent statement,' and, therefore, has probative value." *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 296 (1981). Impeachment in this manner requires a foundation based on several factors: that the witness knew of the charge against the defendant in sufficient detail to realize that he possessed exculpatory information; that the witness had a reason to make the information available; that the witness was familiar with the means of reporting it to authorities; and that neither the defendant nor his lawyer asked the witness to refrain from disclosing the information. See *Commonwealth* v. *Gregory*, 401 Mass. 437, 444-454 (1988), and cases cited; *Commonwealth* v. *Brown*, *supra* at 296-297. Cf. *Commonwealth* v. *Nickerson*, 386 Mass. 54, 58 n.4 (1982) (*Brown* considerations not regarded as exhaustive). The prosecutor established a sufficient foundation to impeach Christian Fraticelli and Jose Feliciano with their failure to bring exculpatory information to the police.

a. *Christian Fraticelli.* The prosecutor specifically asked Christian Fraticelli questions to form a foundation to impeach him with his failure to bring exculpatory information to the police. Christian testified to an incident allegedly transpiring a little over one week before the shooting that killed Harlen Hardrick in which Harlen fired shots at Mario and Christian as they walked down an alley near the apartment block at 489 Pleasant Street. The prosecutor cross-examined Christian on this event and his failure to bring it to the attention of the police when the defendant and Mario were arrested. The pertinent part of the exchange between the prosecutor and Christian is set out in the margin.[7]

The prosecutor established that Christian knew both the

---

[7]Q: "And the first time that you ever talked about it was when Trooper Wilcox came to see you at the jail; correct?"

defendant and Mario and would, therefore, have a reason to want to help them with exculpatory information. Christian was also aware that he knew important information about Harlen's prior shooting at Mario. The jury were free to infer that he knew the information could help the defendant and Mario, and

A: "That's correct."

Q: "And you knew about the shooting in this case; correct?"

A: "When I saw it on the news."

Q: "And you knew Mario?"

A: "Yes."

Q: "And you knew [the defendant]?"

A: "Yes."

Q: "And you knew that he had been charged with [murder in the first degree]?"

A: "When I saw it on television."

Q: "And you certainly know where the Police Department is in Holyoke; correct?"

A: "Yes."

Q: "And you knew that you had some important information about Harlen's shooting at Mario before; correct?"

A: "Yes, but I didn't go to the Police Department and tell them because I was afraid that they would do something to me."

Q: "Well, you knew that that information would help [the defendant] and Mario; correct?"

A: "No, I didn't know."

Q: "You didn't know that the fact that Harlen had shot at him before would help [the defendant] and Mario?"

A: "I didn't know that."

Q: "And you weren't asked by [the defendant] or Mario or any of their attorneys not to report it to the police; correct?"

A: "But I had never spoken to them. This is the first time I talked to them."

Q: "And yet you never reported it to the police thereafter; correct?"

A: "No."

disbelieve his testimony to the contrary. He was aware of the location of the police department in Holyoke, and the jury could infer that he knew the means of reporting the information to the police. The prosecutor also established that neither the defendant nor his attorney asked Christian not to come forward. It is clear on the record that the prosecutor established a sufficient foundation for impeaching Christian on his failure to bring exculpatory information to the authorities.

b. *Jose Feliciano.* The prosecutor also established a sufficient foundation to impeach Jose Feliciano (Jose) with his failure to provide exculpatory information to the police, although it is less obvious on the record. Jose testified that he witnessed the shooting and that he heard a "soft" shot before the loud shots he attributes to Mario, implying that there was another gun. He also testified that Mario was "ducking" before he began shooting, again implying that Mario was avoiding being hit by shots from another weapon. Finally, Jose testified that the defendant was not encouraging his brother to shoot, but instead was trying to calm him down and dissuade him from shooting.

The jury were free to conclude that Jose was aware information known to him would help the defendant and his brother, even though his testimony was inconsistent on this point. He claimed to be an eyewitness to the shooting, and was aware that the defendant and his brother were charged with murder. He was also aware of information tending to show that Mario's actions were in self-defense and that the defendant's actions were not at all criminal. Additionally, he was friendly with both the Hardricks and the Cintrons, and a jury could find that it would be natural for him to want to help a friend with information tending to prove his innocence.

Jose testified that after the shooting occurred, he returned to the back of the apartment building at 489 Pleasant Street for a few minutes and then walked back around to the front. He remained on the scene for a while and was later approached by police and gave a statement. The jury could infer from this testimony that Jose was familiar with the means of reporting information to the police. In fact, he could have disclosed any exculpatory facts when police approached him.

There is no indication in the record that the defendant or his trial counsel asked Jose to refrain from disclosing this information to the police. See *Commonwealth* v. *Roberts*, 433 Mass. 45, 50-51 (2000); *Commonwealth* v. *Mahan*, 18 Mass. App. Ct. 738, 744 (1984). In fact, all indications in the record point to the fact that the defendant and his counsel made no such requests. Jose testified that the first time he told anybody about the information he possessed was when the defendant's trial counsel came to see him. He did not say anything about counsel's asking him to refrain from giving that information to the police.

The conditions for the admission in evidence of Jose's failure to report exculpatory information to the police were largely met, even though the prosecutor elicited foundation testimony inartfully. See *Commonwealth* v. *Richardson*, 425 Mass. 765, 767 (1997); *Commonwealth* v. *Lopes*, 34 Mass. App. Ct. 179, 181 (1993). When viewing Jose's testimony as a whole, it is clear that it would have been natural for him to come forward with exculpatory information and he was properly impeached with his failure to do so. Even if the prosecutor did not lay a foundation sufficiently, the fact that the jury heard that Jose was present at the scene and spoke with the police immediately after the incident, yet did not disclose what he knew did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Richardson, supra.*

E. *G. L. c. 278, § 33E.* We have reviewed the entire record and decline to exercise our extraordinary power to grant the defendant a new trial or reduce the murder verdict. The defendant argues that his actions merit a conviction of voluntary manslaughter, particularly because the prosecution offered both him and his brother, the actual shooter, such a plea arrangement. The fact that Mario agreed to plea to a lesser charge or that the government offered such an arrangement does not warrant § 33E relief for the defendant and is irrelevant to our inquiry. See *Commonwealth* v. *Allen*, 430 Mass. 252, 259 n.6 (1999); *Commonwealth* v. *Valentin*, 420 Mass. 263, 275 (1995); *Commonwealth* v. *Simpson*, 370 Mass. 119, 126-127 (1976). Particularly illuminating on this point is that the defendant was offered a plea agreement on three separate occasions, each

recommendation including a reduced prison sentence. The defendant refused each offer. The judge stated in his memorandum of decision on the defendant's motion for a new trial based on ineffective assistance of counsel that the defendant's testimony was "absolutely unworthy of belief," and that "the defendant is the author of his own woes."[8] The judge also credited the testimony of his trial counsel that when the defendant heard the verdicts he muttered, "I fucked up, I should have pleaded." The defendant's conviction rests on evidence proved at his trial and that proof was sufficient to establish his participation in a premeditated murder. *Commonwealth* v. *Valentin, supra* at 275. In light of these considerations, we hold that the verdict returned by the jury is consonant with justice. *Commonwealth* v. *Lake*, 410 Mass. 47, 51 (1991), and cases cited.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[8]The defendant argues that the judge's comments both at Mario's sentencing and in the denial of the defendant's posttrial motion for a finding of not guilty shed light on considerations important to our review under § 33E. We agree. The judge commented that it "may seem strange" that the shooter would receive a manslaughter conviction while the defendant is convicted of murder in the first degree. He also stated that the results were "unfortunate." More importantly, he stated that both the plea in Mario's case and the sentence handed down in the defendant's case were "well warranted," and that, although the consequences of refusing a plea were "quite grave," nothing "that was done here was inappropriate [to] anybody."